UNITED STATES of America, Plaintiff,

v.

Vance M. THOMPSON et al., Defendants.

M. D. THOMPSON AND SON CO., Plaintiff,

v.

J. H. COTTRELL, Receiver, Defendant. United States of America, Intervenor.

Nos. LR–66–C–60, LR–67–C–36.

United States District Court E. D. Arkansas, W. D.

Aug. 24, 1967.

Wayne W. Owen, of Moses, McClellan, Arnold, Owen & McDermott, Little Rock, Ark., for defendants in LR–66–C–60 and for plaintiff in LR–67–C–36.

W. H. McClellan, U. S. Atty., Eastern District of Arkansas, and Winston Bry-

ant, Asst. U. S. Atty., for plaintiff in LR–66–C–60 and for defendant and intervenor in LR–67–C–36.

HENLEY, Chief Judge.

### Memorandum Opinion

These two cases, which were consolidated for purposes of trial and tried to the Court without a jury, involve the Summit House Apartments in Little Rock, Arkansas. The litigation arose because of the fact that rental income from the apartments was not sufficient to meet construction mortgage payments and to maintain and operate the premises. The owners defaulted in their mortgage payments as of October 1965, and this litigation began in early April 1966.

The construction money loan, made originally by John Hancock Mutual Life Insurance Company, in the principal sum of $3,100,800, was fully insured by the Federal Housing Administration, and in January 1966 the insurance company assigned its security interests to the Federal Housing Commissioner.

Case No. LR–66–C–60, hereinafter referred to as No. 60, was commenced by the Government as a foreclosure suit, and an operating receiver was appointed. Subsequently, the scope of the suit was expanded considerably by amendments to the complaint. The defendants in that case, hereinafter at times called simply the defendants, were Vance M. Thompson of McCrory, Arkansas, and his adult children, Elizabeth T. Russell, H. Ripley Thompson, John G. Thompson, Ruth T. Trammell, William H. Thompson, and Vance M. Thompson, Jr., partners doing business as The Summit House Apartments. The trustee named in the original deed of trust in favor of John Hancock was also named as a formal defendant, but he has no interest in the case.

In No. 60, as it now stands, the Government seeks to foreclose liens on the Summit House real estate, including certain appliances specifically described in a security instrument separate and distinct from the basic deed of trust, and on the furniture in the apartments. The Government also seeks an injunction to enforce certain alleged easements giving convenient access to the premises. And it seeks a money judgment against the partnership and its members for alleged improper transfers and disbursements of project funds as well as for real estate taxes which the Government has been required to pay since taking over the project.

The defendants concede that the Government is entitled to foreclosure on the real estate and appliances. The defendants deny that the Government is entitled to foreclosure with respect to the furniture, deny that the Government has any easements appurtenant to the premises, as it contends, and deny that the Government is entitled to money judgment against them in any sum.

Case No. LR–67–C–36, hereinafter called No. 36, involves the Summit House furniture. It is an action brought by M. D. Thompson & Son, Inc., an Arkansas corporation, against the receiver appointed in No. 60; plaintiff alleges that it has a valid lien on the furniture superior to any claim of the Government, and the complaint charges that the receiver in No. 60 unlawfully converted the furniture and is liable on account of the alleged conversion. The suit was commenced in the Chancery Court of Pulaski County, Arkansas, and was removed here by the receiver. The Government has intervened as a party defendant. The receiver and the Government deny that M. D. Thompson & Son, Inc., has any claim to the furniture superior to the claim of the Government.

Taken together, the two cases involve the following matters and issues:

1. The conceded right of the Government to foreclose on the real estate and appliances.

2. Whether the deed of trust in favor of John Hancock covers the furniture and, if so, whether the lien of the deed of trust is valid as against M. D. Thompson & Son, Inc., which corporation claims to be a secured creditor with respect to the furniture.

3. Whether the Government owns easement rights as claimed by it.

4. Whether and to what extent the defendants are personally liable to the Government for alleged diversions and improper expenditures of project funds and for taxes.

The materials before the Court consist of the pleadings and exhibits, oral testimony, documentary evidence, and memorandum briefs. There is very little dispute about the facts in the case, although some of the facts are not entirely clear.

The Summit House is a "high rise" apartment building located on North University Avenue in the City of Little Rock. It is bounded on the north by certain land owned by Vance M. Thompson personally.[1] The project is bounded on the south by the properties of the Park Plaza Shopping Center. The Shopping Center is a partnership made up of Stephens Co., Inc., which owns 50 percent of the enterprise, Vance M. Thompson, who owns 12.5 percent, and Thompson Brothers Investment Co., which owns 37.5 percent of the enterprise.[2]

The Summit House was built entirely on borrowed money with the borrowers not being subject to any personal liability for the payments called for by the note and deed of trust. John Hancock was willing to make the loan on the sole security of the properties and their projected earning capacity because of the fact that the Federal Housing Administration was willing to insure the loan to the extent of 100 percent.

Construction of the project was undertaken originally by Paul Kapelow and Lester Gross, and the basic contract documents are a note and deed of trust in favor of the insurance company executed by Gross and Kapelow, and a regulatory agreement entered into between the Federal Housing Commissioner, on the one hand, and Gross and Kapelow, on the other hand. All of those instruments are dated October 8, 1962; the deed of trust and the regulatory agreement were duly filed for record among the land records of Pulaski County.

Construction of the project began in 1962 and continued throughout 1963 and possibly into 1964. Occupancy of the apartments began in early 1964. The John Hancock loan was finally approved for insurance and was disbursed in March 1965.

In 1963 the Thompson partnership, with the consent of the Federal Housing Administration, acquired the interest of Kapelow and Gross for a consideration of $490,000. The partnership assumed the deed of trust in favor of John Hancock and also assumed the obligations of the regulatory agreement which has been mentioned. On November 4, 1963, the defendants and the Federal Housing Commissioner executed a "Modification Of Mortgage And Assumption Of Regulatory Agreement." In substance, that agreement provided, among other things, that the defendants assumed the obligations of Kapelow and Gross but were not personally liable for the payments due under the note and deed of trust or for the payments into the reserve for replacements called for by the original regulatory agreement, or for matters not under their control. However, it was agreed that the defendants, like Kapelow and Gross before them, would be liable personally for funds or property of the project coming into their hands which they were not entitled to retain.

Defendants' articles of co-partnership and the books of the partnership were not made of record here, and it is not possible for the Court to determine the initial capitalization of the partnership. The evidence does reflect that the partnership or its individual members, particularly Mr. Thompson, advanced to the project sums totalling $118,863.80 in addition to the $490,000 paid Kapelow and Gross for their interest.

---

1. For convenience Vance M. Thompson will be referred to at times as Mr. Thompson.

2. Thompson Brothers Investment Co. is a partnership made up of the same adult children of Mr. Thompson as are defendants in No. 60.

The partnership at an early stage employed the Little Rock real estate concern of Farris & Co., Inc., hereinafter Farris, as managing agent for the project. Farris administered the project, collected the rents and disbursed funds coming into its hands by way of rentals and by way of advances from the partnership. Project funds handled by Farris were deposited in the Union National Bank at Little Rock; Farris maintained two project accounts, one known as the escrow account, and the other known as the expense account. There was probably some difference between the two accounts, but that difference is not significant here; the auditor for the defendants, who testified at the trial, treated the two accounts as one, and the Court will so treat them.

Of the $118,863.80 advanced to the project by the partnership $25,894.12 was deposited initially in the Farris account and was disbursed by Farris; the other sums advanced did not go into the Farris account.

Tenants of the Summit House paid rent on their apartments and those who rented furnished apartments paid additional rent on their furniture. All rentals were paid into the Farris account. Prior to the receivership Farris collected $602,716.52 as apartment rentals and $18,396.03 as furniture rental.

Farris did not keep the books of the partnership. Those books were maintained at McCrory, Arkansas, which City is the headquarters for the widely diversified operations of Mr. Thompson, and the partnership maintained a bank account in the Bank of McCrory. As stated, the partnership books were not brought into the record, nor were the records of the partnership's McCrory bank account introduced.

As legal counsel the partnership retained the Little Rock law firm of Moses, McClellan, Owen and McDermott. That firm performed substantial services for the partnership in acquiring the properties, settling a number of lien claims of laborers and materialmen which had accrued in connection with the project's construction, and in assisting in the final

closing of the loan. Fees paid to the attorneys by the partnership totalled $20,000.

The partnership failed to make the mortgage payment which fell due on October 1, 1965, and the default was never remedied; however, the partnership continued to operate the project until the receivership, and during the interim continued to collect rents and make disbursements. Between October 1, 1965, and February 9, 1966, the partnership disbursed to Worthen Bank & Trust Co. of Little Rock sums totalling $14,931.78 in repayment of a loan of $15,000 which the Worthen Bank had made to the partnership. During the same period payments totalling $13,000 were made to Moses, McClellan, Owen & McDermott for services previously rendered. All of those disbursements came from the Farris account, and the funds used represented rental income.

The complaint in No. 60 was filed on April 4, 1966; on April 7 the defendants waived service of process and entered their appearance in the case. The receiver was appointed on April 15 and qualified on the same day.

On April 11, four days before the receiver took over, there were still substantial sums of money on deposit in the Farris account. On that date Farris, at the direction of Mr. Thompson, drew two checks in favor of the partnership. One of those checks was in the sum of $45,000, and the other in the sum of $313.50. On April 29 Farris drew another check in favor of the partnership in the sum of $1,025.88. Mr. Thompson ultimately received to his own use the proceeds of the $45,000 check; the proceeds of the other two checks finally went into the hands of the receiver. Those two checks plus another payment of $80.62 make up the $1,420 which, according to the report of the defendants' auditor, the receiver finally obtained from the project.

The foregoing statement of facts will be amplified, and other facts will be stated in the course of the discussion of the specific issues in the two cases.

## I.

As indicated, the defendants do not deny that the Government is entitled to foreclose on the real estate and on the appliances described in the security agreement dated March 15, 1965, and executed by the partnership in favor of John Hancock.

In this connection the Court should say that at the commencement of the trial counsel for the defendants submitted a motion for a continuance in No. 60 and for a consolidation of that case with two other cases pending on the docket of Judge Gordon E. Young and involving alleged improper construction of the Summit House by Kapelow and Gross. The Court reserved ruling on the motion and proceeded to hear the evidence in the case.

The motion is not urged in defendants' post-trial brief, and, indeed, in that brief counsel suggests that the decree provide for foreclosure of the lien created by the deed of trust. Apart from the concession just mentioned, the Court is satisfied that there is no real relationship between No. 60 and the two cases on Judge Young's docket and that foreclosure in No. 60 should not, in any event, await the termination of the other litigation which may not come about for quite some time.

■ In its original complaint the Government asked for personal judgment against the Thompson partnership for the unpaid balance of the original note and for real estate taxes. In its brief the Government does not press those particular claims, and they are without merit. The real estate taxes were required to be paid by the provisions of the deed of trust, and the defendants have no personal liability for payments called for by either the note or the deed of trust, except to the extent that they are liable for any project funds improperly received and retained by them.

## II.

The controversy about the furniture is involved in No. 60 but actually comes into focus in No. 36. With regard to the furniture the picture disclosed by the evidence is anything but clear; however, the Court finds the controlling facts to be as follows:

During 1964 and 1965 numerous items of furniture such as beds, tables, chairs, sofas, and the like, were installed in the Summit House. That furniture which had a total invoice price of about $104,-000 was billed to and paid by M. D. Thompson & Son, Inc.

M. D. Thompson & Son, Inc., is a mercantile concern with an established line of credit and which deals in furniture and many other lines of goods. The corporation was originally owned by Mr. Thompson and his father, with Mr. Thompson being the "Son" appearing in the corporate name. After the elder Thompson's death at some undisclosed time in the past, Mr. Thompson was in control of the corporation. However by 1962 Mr. Thompson had divested himself for tax purposes of all of his stock ownership, although he remained and now is an officer of the corporation; from 1962 on the stock was owned by Mr. Thompson's wife, his children, and his grandchildren. Thus, the adult children of Mr. Thompson who, with him, make up the partnership known as The Summit House Apartments, are also stockholders in the corporation.

Although Mr. Thompson no longer owns stock in the corporation, the Court finds that the corporation and the partnership are both "Vance M. Thompson" enterprises, and that Mr. Thompson is the dominant figure in both enterprises. While there is no direct evidence to that effect, the Court thinks its ruling on the point is an inference justified by the evidence as a whole.

As stated, the corporation bought the furniture and paid for it; the corporation then sold the furniture to the partnership on credit. However, there were no bills of sale or contemporaneous contracts of sale; there is no satisfactory evidence as to the terms agreed upon at the time or times when the various items of furniture were bought and installed in the Summit House. Presum-

ably, the transactions were reflected on the books of the corporation as receivables and on the books of the partnership as payables, but the Court does not know that such was done.

The parties seem to have contemplated in a vague sort of way that the rentals paid on the furniture by the tenants would eventually pay for the furniture. However, those rentals were not in fact so applied. In this connection it appears from the testimony of Mr. Thompson, who had no books before him, that either the corporation or the partnership borrowed about $30,000 from a bank in Crossett, Arkansas, and the proceeds of the loan were credited to the partnership on the books of that concern. That loan had nothing whatever to do with the furniture, but it was discharged in part by the rentals collected from the furniture, and ultimately the partnership was given credit for those rentals on the books of the corporation.

Prior to February 10, 1966, there was nothing of record anywhere to apprise anyone that M. D. Thompson & Son, Inc., had any interest in the furniture whatever. As of that date the partnership was in default, the note and deed of trust had been assigned by the insurance company to the Government, and all parties concerned, notably including Mr. Thompson must have known that foreclosure was imminent.

On the date just mentioned the partnership executed in favor of the corporation a promissory note in the principal sum of $104,897.79 representing the cost price of the furniture, said note to be payable in installments over a period of 11 years; the note gave credit to the partnership in the sum of $17,109.06, so that the net principal of the note was $87,788.73.[3]

On the same day the partnership executed and delivered to the corporation a security agreement covering the furniture, and also executed and delivered a "financing statement" covering the furniture, which statement was filed in accordance with the relevant provisions of the Uniform Commercial Code, which is in effect in Arkansas. Ark.Stats., Ann., Title 85, particularly Article 9 dealing with secured transactions.

In this litigation the position of M. D. Thompson & Son, Inc., is that the Government's deed of trust does not cover the furniture, and that even if it does, the lien on the furniture is not valid as to third parties because the filing of the deed of trust among the land records of Pulaski County was not sufficient under the Uniform Commercial Code to constitute a valid lien on personal property as far as third parties are concerned. Cf. In re King Furniture City, E.D.Ark., 240 F.Supp. 453, 457; United States v. Baptist Golden Age Home, W.D.Ark., 226 F.Supp. 892.

The position of the Government is that the deed of trust covers the furniture and that the lien is valid as to the corporation although the Government does not contend that the filing requirements of the Uniform Commercial Code were met as far as the furniture is concerned. With respect to the validity of the lien as against the corporation the Government contends, first, that the furniture transactions between the corporation and the partnership were mere paper transactions and shams having no business reality, and, second, that in any event the lien is valid as to the corporation because it had actual knowledge of the Government's lien. Ark.Stats., Ann., § 85–9–401(2) ; In re King Furniture City, supra.

 The Court finds that the deed of trust specifically included all furniture placed in the Summit House and rejects the contention of the defendants

3. The credit given on the note approximates but does not coincide with the amount of furniture rentals received. The audit report introduced by the defendants shows that furniture rentals of $18,-396.03 were received, and that $16,- 104.74 was disbursed as "mortgage payments." The credit given on the note in favor of the corporation falls between those two figures. The difference of $2,291.29 is shown in the audit report as a "surplus" figure.

and the corporation that the deed of trust was limited to articles affixed or attached to the realty. The Court also rejects the contention advanced in the post-trial brief of the partnership and corporation that when John Hancock took a security agreement with respect to certain specific appliances, that action manifested an intention that no other personal property would be subject to the insurance company's lien.

The items covered by the specific security agreement consisted of a number of free standing cooking ranges and some built-in cooking equipment. It would appear that those items were covered by the deed of trust, and there is no explanation as to why John Hancock wanted a separate agreement with respect to them. However, there is certainly nothing to suggest that in taking the separate agreement the lender intended to waive its security interest in other items of personalty.

The Court further finds that the lien of the deed of trust was valid as between the parties to that instrument. 14 C.J.S. Chattel Mortgages § 29; 59 C.J.S. Mortgages § 190, particularly § 190b; White v. Murtha, 5 Cir., 343 F.2d 831, 834–836.

As to the validity of the lien as against the corporation, the Court thinks that there is much to be said in support of the Government's contention that there was an identity of interest between the corporation and the partnership, and that the initial "purchase" of the furniture by the corporation and the subsequent "sale" by the corporation to the partnership was merely sham and colorable. Certainly the furniture dealings between the corporation and the partnership do not appear to have been arms' length transactions carried out as such transactions usually are between a seller and a buyer of goods having a total price of more than $100,000.

However, the Court finds it unnecessary to rule firmly on that particular contention of the Government because the Court is persuaded that the corporation, through Mr. Thompson, had actual knowledge of the contents of the deed of trust. Mr. Thompson will not be heard to say that he did not know what the deed of trust said about furniture, and what Mr. Thompson knew the corporation knew.

The situation presented here is not dissimilar to that which arises when two corporations deal with each other through a common officer. In such a situation if there is a conflict of interest between the two corporations, the general rule is that knowledge which the officer gains by virtue of his connection with one of the corporations is not imputed to the other. 19 Am.Jur.2d, Corporations, § 1268; Bank of Hartford v. McDonald, 107 Ark. 232, 154 S.W. 512. That general rule, however, does not appear to the Court to be helpful to the corporation here.

To start with, the Court has indicated already that the furniture dealings between the corporation and the partnership were not at arms' length, and there was no real conflict of interest between the two Thompson enterprises. It seems clear to the Court that the method of acquiring the furniture which the parties employed was adopted purely as a matter of convenience and probably because the corporation might have been able to buy for better prices or on better terms than could the partnership.

Further, the general rule is not without its exceptions. The question of imputation of the knowledge of the common officer must be resolved in the light of the facts and circumstances of each particular case, and the fact that "the common officer is the principal stockholder or the managing officer of the corporation to which his knowledge is sought to be imputed is a circumstance of importance in this connection." 19 Am.Jur. 2d, supra, p. 675.

Here we have a family corporation and a family partnership without any really conflicting interests; Mr. Thompson dominates both. When due weight is given to all of the facts and circumstances here present, we think that the

knowledge of Mr. Thompson as a partner is the knowledge of the corporation as far as the furniture is concerned.

■ The Court holds, therefore, that the Government's lien covers the furniture, and that it is valid as to the corporation. The Government's lien is also prior to that of the corporation because the corporation's financing statement was not filed contemporaneously with the delivery of the furniture or within ten days after such delivery. Ark.Stats., § 85–9–312; United States v. Baptist Golden Age Home, supra, 226 F.Supp. at 903–904. Hence, the Government will prevail with respect to the furniture.

### III

Up to this point the Court has stated no facts relative to the controversy about the easements. It now becomes necessary to do so.

According to the original plans, access to the Summit House was to be from North University Avenue which bounds the properties on the east, and two driveways leading from that street into the properties were constructed. Unfortunately, from the standpoint of ingress to and egress from the Summit House, North University Avenue is a divided four lane street, and the divider is not open opposite the Summit House driveways. This creates no problem for a driver approaching the Summit House from the north or to one who leaves it with the intention of turning to his right and going south on University. It does, however, create a very distinct problem for a driver who approaches the property from the south or for one who desires to head north upon leaving the premises.

After the partnership acquired the interest of Kapelow and Gross, the boundary between the Summit House property and the Shopping Center property was cut at three places so that Summit House tenants and others might enter and leave the Summit House by driving through and over the Shopping Center parking lot. In fact, the Summit House parking lot, located on the west side of the premises, is directly adjacent to the Shopping Center parking lot, and matters were so arranged that Summit House tenants and their guests could drive directly from the Shopping Center lot into the Summit House lot. Early in 1964 the Summit House management placed a number of carports on the parking lot for the convenience of tenants. If a tenant agreed to pay $10 a month extra rent for a period of 18 months, he could have the use of a carport permanently without paying additional rent therefor after the 18th month.

After Mr. Thompson bought the land immediately to the north of the Summit House, he opened a driveway across that property leading from the Summit House to Lee Avenue. Lee Avenue intersects North University, and if a person can use the driveway across the Thompson property, he is not inconvenienced greatly by the fact that North University is, in general, a divided street.

The Court finds that the existence of the above described access routes in addition to the regular driveways enhanced the rentability of the apartments, and it is inferable that at least some tenants rented Summit House apartments in the belief that all of the access routes would be available during their tenancies. It is also possible that some tenants would not have rented Summit House apartments if the only means of access had been from North University Avenue. The additional access was provided not only for the purpose of attracting tenants but also for the purpose of stimulating trade between Summit House tenants and merchants doing business in the Shopping Center.

Some months after No. 60 was commenced Mr. Thompson caused all of the additional access routes to be closed by means of concrete posts so that now access to the premises is limited to the driveways opening on North University Avenue, and so that Summit House tenants and visitors have again been subjected to the described inconveniences incident to the use of those driveways. The Summit House carports are now inaccessible until other access is provided.

The Government contends that the actions of Mr. Thompson in making the additional access routes available created easements appurtenant by way of estoppel or by implication of law. The defendants deny that any easements were created and contend that use of the additional access was permissive only, and that Mr. Thompson and the Shopping Center were free to prohibit that use at any time and for any reason.

For purposes of discussion at least the Court will accept the premise of the Government that if the additional access routes amounted to easements, the Government is entitled to protect them in this action. To put it another way, if the additional routes were in fact and law easements appurtenant to the premises, the Court agrees that the defendants could not legally abandon them to the prejudice of the insurance company or of its assignee, the Government.

But, the Court is not able to find that the additional access routes amounted to easements either by estoppel or by implication.

■ An "easement by estoppel," as the Court uses the term, means an easement which is created when a landlord voluntarily imposes an apparent servitude on his property and another person, acting reasonably, believes that the servitude is permanent and in reliance upon that belief does something that he would not have done otherwise or refrains from doing something that he would have done otherwise. See 25 Am.Jur.2d, Easements and Licenses, § 18; Holbrook Irrigation District v. Arkansas Valley Sugar Beet & Irrigated Land Co., D.C.Col., 42 F.2d 541, 548. It is familiar law that an estoppel in pais or an equitable estoppel does not arise in the absence of a change of position on the part of the party invoking the estoppel. American Casualty Co. of Reading, Pa. v. Hambleton, 233 Ark. 942, 349 S.W.2d 664; Storey v. Brewer, 232 Ark. 552, 339 S.W.2d 112; Pohnka v. First National Bank of Wynne, 224 Ark. 599, 275 S.W.2d 641; James Talcott, Inc. v. Associates Discount Corp., 8 Cir., 302 F.2d 443; Worthen Bank & Trust Co. v. Franklin Life Ins. Co., E.D. Ark., 260 F.Supp. 1, aff'd 8 Cir., 370 F. 2d 97.

■ It is in the principle just stated that the difficulty with the Government's "easement by estoppel" theory lies. The basic contract between Kapelow and Gross, on the one hand, and John Hancock and the Federal Housing Administration, on the other hand, was made in 1962; no access to the Summit House in addition to the access from North University was provided until the partnership acquired the interest of Kapelow and Gross in 1963. The insurance company did not make the loan, and the Government did not insure the loan, in reliance on the existence of the additional access routes. It is true that the John Hancock loan was not finally insured and disbursed until March 1965, but there is no evidence here that the consummation of those transactions was in any way influenced by the existence of the additional access routes. In other words, neither the insurance company nor the Federal Housing Administration changed its position in reliance on the additional routes.

The Government argues that tenants acted to their detriment in reliance on the existence of the additional access. That may well be true, and it may be assumed without deciding that individual tenants might have some rights during their individual tenancies to use the additional access, but that, in the Court's estimation, is not sufficient to give the Government any easement rights in perpetuity with respect to that access.

■ The Government's "easement by implication" theory is based upon the rule laid down by the Supreme Court of Arkansas in Greasy Slough Outing Club v. Amick, 224 Ark. 330, 274 S.W.2d 63, and earlier Arkansas cases cited in the opinion in that case. That rule may be stated substantially as follows: Where, during unity of title, a landowner imposes an apparently permanent and obvious servitude on part of his property in favor of another part, and where at the time of a later severance of owner-

ship the servitude is in use and is reasonably necessary for the enjoyment of that part of the property favored by the servitude, then the servitude survives the severance and becomes an easement by implication. In order for such an easement to be established it must appear not only that the easement was obvious and apparently permanent but also that it is reasonably necessary for the enjoyment of the property, the term "necessary" meaning that there could be no other reasonable mode of enjoying the dominant tenement without the easement. An easement by implication does not arise merely because its use is convenient to the beneficial enjoyment of the dominant portion of the property. (224 Ark. at 337–338, 274 S.W.2d 630)

The principle of Arkansas law stated in Greasy Slough and the earlier cases is a conventional one. 25 Am.Jur.2d, supra, §§ 27 et seq.

The Government argues that the additional access routes were obvious and apparently permanent, and that their continued use is necessary to the enjoyment of the Summit House properties; that when the routes were opened there existed what "amounted to" a unity of title or ownership of the individual Thompson property, the Summit House property, and the Shopping Center property, and that when by virtue of these proceedings severance of the alleged unitized ownership took place or became imminent, the access routes became easements appurtenant to the Summit House properties.

There are two things wrong with that argument.

 First, unity of title or ownership simply did not exist nor did there exist anything which "amounted to" such unity. The Court does not think that any such unity can be found in the mere fact that Mr. Thompson serves as connecting links between the Summit House and his own property to the north and between the Summit House and the Shopping Center property to the south. He owns the fee of the property to the north; he owns partnership interests in the Summit

House property and the Shopping Center property but the two partnerships are entirely different. There has never been any unity of possession or use of the three parcels of land.

 Next, it is noted that while the additional access is convenient to the enjoyment of the Summit House properties, it is not necessary. Although the tenants cannot now make use of a portion of the parking lot and of the carports, and although they are subjected to the inconveniences of coming in and going out by way of North University Avenue, they still in fact come in and go out.

Further, the Court finds that although the inconvenience which the absence of the additional access routes entails cannot be eliminated entirely, it can be mitigated substantially at reasonable cost by constructing additional driveways on the Summit House properties, and that the carports and parking lot can be made available to tenants by making a connection between the parking lot and a public street or road located adjacent to the properties on the west. Cf. Cherry v. Brizzolara, 89 Ark. 309, 116 S.W. 668.

So, the easement issue will be resolved against the Government.

### IV

There remains to be considered the controversy about certain disbursements made out of the Farris account after default but before this litigation was commenced, and about the final liquidation of that account after No. 60 was filed.

The Court rejects the claims of the Government based on the $313.50 check, dated April 11, 1966, and made payable to the partnership, and upon the $1,025.88 check, dated April 29, 1966, and payable to the partnership. The Government concedes that the receiver obtained the proceeds of the larger check, and the Court finds from the evidence that he received ultimately the proceeds of the smaller one.

Those rejections leave in controversy the $45,000 check dated April 11, 1966, the proceeds of which Mr. Thompson re-

ceived personally; the payments made to the Worthen Bank & Trust Co. totaling $14,931.78, and the payments to Moses, McClellan, Owen & McDermott totaling $13,000. A related item in controversy is a $5,000 check drawn on the partnership account in the Bank of McCrory and payable to Elena Mining Co. All of those payments were made after default, and all of them, except the payment to Elena Mining Co., were made by checks drawn on the Farris account, which account on and after October 1, 1965, had nothing in it except rental income and tenants' deposits. ·

The deed of trust gave the lender a specific lien on the rents derived from the Summit House, and the regulatory agreement between the Federal Housing Commissioner, on the one hand, and Gross and Kapelow, on the other hand, which agreement was assumed by defendants, contained .clear restrictions on the right of the borrower to disburse funds and distribute assets.

Section 6(b) of the agreement prohibited the borrower, without the consent of the Federal Housing Commissioner, from assigning, transferring, disposing of or encumbering any personal property of the project, including rents, and from paying out any funds except from "surplus cash," except for reasonable operating expenses and necessary repairs. Section 6(e) prohibited the borrower, without the consent of the Commissioner, from making, receiving or retaining any distribution of assets or any income of any kind from the project except "surplus cash" and then only under certain conditions.

Section 9(g) required the borrower to deposit all rents and other receipts in the name of the project in a bank, the deposits in which were insured by the F. D. I. C. It was provided further that: "Such funds shall be withdrawn only in accordance with the provisions of this agreement for expenses of the project or for distributions of surplus cash. Any owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such

funds in the project bank account and failing so to do in violation of this agreement shall hold such funds in trust. Any owner receiving property of the project in violation of this agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust."

Section 12(g) defined "surplus cash" as being any cash remaining after:

"(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage whether or not insured or held by the Federal Housing Commissioner;

(ii) All amounts required to be deposited in the Reserve Fund for Replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Commissioner; and

"(2) the segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project;

(ii) All tenant security deposits held; * * *."

And section 12(h) defined a "distribution" as being "any withdrawal or taking of cash or other assets of the project other than for mortgage payments or for payment of reasonable expenses incident to its operation and maintenance."

As indicated, the borrower was not personally liable for payments due under the note and deed of trust, but was liable for funds or property coming into its hands which it was not entitled to retain.

When the challenged payments were made, there was no "surplus cash" in the coffers of the Summit House. Indeed, the project viewed apart from the individual members of the partnership was probably insolvent, although the Court finds it unnecessary to make any finding on that point. Hence, except to the extent, if any, to which the payments in question can be characterized as legitimate "oper-

ating expenses" of the project, they were in violation of the regulatory agreement.

In resisting the monetary claims of the Government the defendants contend basically that they made advances to the project, which they were not required to make, far in excess of the amounts demanded by the Government, and that the regulatory agreement to the contrary notwithstanding they were entitled to recoup themselves, either directly or indirectly, out of project funds to the extent of their advances, and that the advances exceeded available project funds. It has been observed already that the partners advanced nearly $119,000 to the project. Only a little more than $60,000 was returned to the partners.

While the partnership was not required to advance funds to the project, it is clear that in the absence of such advances the project would never have been able to get off the ground. The advances were made by the partnership not to protect the insurance company or the Government or to enhance the security but to promote the interests and expectations of the partners. The Government never guaranteed the partnership that the Summit House operation would be successful or profitable, and the Government never assumed the risk of loss should the project fail, except that the Government was willing to insure a loan which had for its security only the property itself, there being no personal recourse against the borrower.

In United States v. Ivy Hall Apartments, Inc., 3 Cir., 310 F.2d 5, United States v. Pine Hill Apartments, 5 Cir., 261 F.2d 667, and United States v. Sullivan, W.D.Pa., 214 F.Supp. 701, it was held that stockholders in corporations operating apartment houses covered by F. H. A. insured mortgages who made advances to the corporations were simply unsecured creditors and had no rights superior to those of the Government under the mortgages or under the federal Priority Statute, 31 U.S.C.A. §§ 191, 192.

In at least one respect the position of the defendants here seems to the Court to be weaker than the position of the corporate stockholders in the cases last cited. Those stockholders had lent money to corporations which were entities distinct from the stockholders. Here, we have no corporate entity. The partners simply advanced money to their own partnership to enable it to get started and to operate. At an earlier point the Court has stated that it could not determine what the original capitalization of the partnership was; whatever it was, it is clear that the partners hazarded their initial investment. And, the Court is convinced that the advances now relied on by defendants were but additional capital investments which the partners also risked.

Having rejected what may be called the defendants' "recoupment argument," it becomes necessary to determine whether the challenged disbursements of project funds were authorized by the regulatory agreement as operating expenses.

The contract documents do not define the term "operating expenses," and it is a term which probably has no fixed, precise or inflexible meaning. Regard must be had to the context in which the term is used and to the nature of the business under consideration. In present context the Court is convinced that the term must be construed with at least reasonable strictness and that the concept of "operating expenses" should be limited to expenses paid or incurred in connection with the actual operation of the Summit House as a going concern. Capital expenditures should be excluded, of course, and the Court thinks that there should be excluded also expenses paid or incurred in connection with readying the project for operation.

From what has just been said it follows automatically that the partnership must be held liable for the $45,000 transferred from the Farris account by means of a check payable to the partnership, the proceeds of which check Mr. Thompson eventually received and retained to his own use. The transfer of that sum from

the Farris account and its ultimate receipt by Mr. Thompson were in no sense the payment of any operating expense of the project; it was simply an unauthorized distribution of project funds.

■ The Court takes up next the $5,000 check drawn on the partnership account in the Bank of McCrory and payable to the Elena Mining Co. With regard to that check and to other items in controversy, it appears to the Court that since those payments were not made from "surplus cash," the burden of justifying them is upon the defendants.

No one claims that the payment to the Elena Mining Co. represented a payment of any operating expense of the project. The theory of the defendants is that after Mr. Thompson received the $45,000 check he deposited it to the credit of the partnership account at McCrory, and that the check in favor of the mining company drawn on that account came out of the $45,000 payment so that to charge the partnership with the $45,000 and the $5,000 would be a duplication in charges.

To support that theory defendants rely solely on the testimony of Mr. Thompson. Again, the Court calls attention to the fact that the partnership books and records of the partnership bank account were not put in evidence.

Mr. Thompson testified that he deposited the $45,000 check in the bank at McCrory, and that the proceeds of that deposit were disbursed to him personally by means of three checks, including the Elena Mining Co. check, which he caused to be issued for his own ends.

Unfortunately, the reproduction of the $45,000 check which is in evidence and which is quite legible does not bear out Mr. Thompson's testimony that it was deposited in the bank at McCrory. On the contrary, an examination of the check indicates that on April 12, 1966, the day after issue, it was either cashed at the drawee bank in Little Rock or was deposited in some other account in that bank. In that connection no stamp of the Bank of McCrory appears on the check, and the only stamp which does

appear on it is the "Paid" stamp of the Union National Bank, and a bank notation following the endorsement shows the same bank identification number as is shown on the face of the check as the identification number of the Union National Bank on which the check was drawn.

In the circumstances the Court cannot accept, at this time at least, Mr. Thompson's testimony about what was done with the $45,000 check and about the relationship of the $5,000 check to the $45,000 check. However, if within one week from the filing of this opinion the partnership can make a satisfactory showing that Mr. Thompson's ultimate receipt of the $45,000 included the $5,000 check in question, recovery with respect to the latter check will be denied. In the absence of such a showing, which may be made by affidavit, copies of records and documents, or the like, the partnership will be charged with the $5,000 check in addition to the $45,000 check.

■ As has been said the checks delivered to Worthen Bank & Trust Co. discharged a loan from that bank to the partnership in the original sum of $15,000. The proceeds of that loan were not used to pay any operating expenses of the project, and, as a matter of fact, the partnership derived little, if any, benefit from the loan. The history of the transaction is about as follows:

At some stage of the project's operation it was determined that a private club should be operated on the project premises for the entertainment and refreshment of the tenants and their friends. A corporation, known as Southwest Leasing Corporation, was formed in connection with the proposed club. Mr. Thompson was a stockholder in that corporation; other stockholders were not identified.

Southwest Leasing Corporation rented space in the Summit House and then seems to have sublet those premises to the individual who was actually to operate the club which was to be known as the "400 Club." The proceeds of the

loan from the Worthen Bank were turned over to Southwest Leasing Corporation and were used by it to furnish and equip the club premises.

The operator of the club was supposed to pay rent at the rate of $1,000 per month plus additional rent for his furniture and equipment, which additional rent was supposed to retire the bank loan. The operator never was able to pay anything on the furniture and equipment and, indeed, fell into default with respect to the rent. The rent which he paid did go into the Farris account.

The club was still operating when the receiver took over, but it closed soon thereafter, and the furniture, fixtures, and equipment were sold at auction; the partnership did not receive the proceeds of the sale.

Regardless of whether it was advisable from a business standpoint for the partnership to borrow $15,000 and turn the money over to Southwest Leasing Corporation to equip the club, the expenditure was in the nature of a capital investment and was not an operating expense. Hence, the repayment of the loan after default on the mortgage debt was prohibited by the regulatory agreement, and the partnership must be charged with the two checks drawn in favor of Worthen Bank & Trust Co.

The final items to be considered are the payments made to Moses, McClellan, Owen & McDermott. The Court starts with the proposition that attorneys' fees may well be operating expenses of an apartment house project. Such a project in the course of its day to day operations may require the services of counsel to collect rents, to evict tenants, or to prosecute and defend lawsuits growing out of the operation of the project. And fees paid for services of those types may properly be characterized as operating expenses of the project.

The Court's difficulty on this phase of the case is that the legal services performed by the attorneys for the partnership and for which services the attorneys were paid after default do not seem to be of a type which would entitle the fees to be classified as operating expenses. As has been stated, the services were in connection with the acquisition of the project by the partnership, receiving final approval and disbursement of the loan, and the settlement and elimination of lien claims so that the partnership would be in a position to operate the project. No one questions that valuable legal services were performed, and no one questions the reasonableness of the fees paid; but, those fees were simply not operating expenses, and their payment was forbidden by the regulatory agreement.

Appropriate decrees will be entered in both cases. The decree in No. 36 will simply dismiss the complaint therein with prejudice and at the cost of M. D. Thompson & Son, Inc. The decree in No. 60 will grant foreclosure as to the real estate, the appliances covered by the separate security agreement, and the furniture; the decree will also award personal judgment against the partnership in the sum of either $77,931.78 or $72,931.78, depending on whether the $5,000 Elena Mining Co. check is included or excluded, with interest thereon at the rate of six percent per annum from April 15, 1966; the prayer of the Government for equitable relief to protect the alleged easement rights will be denied, and the Government's claim for taxes will be denied also: costs will be taxed against the partnership. The present receiver will be named the Commissioner of the Court to advertise and conduct the foreclosure sale. Counsel for the Government is directed to prepare and submit appropriate decrees after securing the approval of opposing counsel as to the form of the decrees.