UNITED STATES of America, Plaintiff,

v.

MANSION HOUSE CENTER NORTH REDEVELOPMENT COMPANY, a limited partnership, Mansion House Center Redevelopment Company, a limited partnership, Mansion House Center South Redevelopment Company, a limited partnership, Mansion House Center North Redevelopment Corporation, a corporation, and Maurice B. Frank, General Partners of Mansion House Center North Redevelopment Company, a limited partnership, Mansion House Center Redevelopment Corporation, a corporation, and Maurice B. Frank, General Partners of Mansion House Center Redevelopment Company, a limited partnership, Mansion House Center South Redevelopment Corporation, a corporation, and Maurice B. Frank, general partners of Mansion House Center South Redevelopment Company, a limited partnership, Remsco Management, Inc., a corporation, Mansion House Motor Hotel Company, a limited partnership, Ocean Sea Breeze, Inc., a corporation, and Maurice B. Frank, general partners of Mansion House Motor Hotel Company, a limited partnership, Mansion House Motor Hotel Corporation, a corporation, Willowbrook Realty, Inc., a corporation, Heftler, Pierre V. (9/1/77), Ehrlich, E. J. (9/1/77), Perry, Hart (9/1/77), Altman, Norman S. (9/1/77), Mansion House Center North Tower Redevelopment Corporation (9/1/77), Mansion House Center Tower Redevelopment Corporation (9/1/77), Mansion House Center South Tower Redevelopment Corporation (9/1/77), Defendants.

No. 76–20C(3).

United States District Court,
E. D. Missouri, E. D.

March 27, 1978.

Joseph B. Moore, Asst. U. S. Atty., U. S. Dept. of Justice, St. Louis, Mo., J. Christopher Kohn, Civ. Div. U. S. Dept. of Justice, Washington, D. C., Donald F. Flint, Area Counsel, Dept. of Housing and Urban Development, St. Louis, Mo., for plaintiff.

Gerald A. Rimmel, pro se.

Gene M. Zafft and Merle L. Silverstein, Rosenblum, Goldenhersh, Silverstein & Zafft, St. Louis, Mo., for receiver Rimmel.

Frank A. Bussmann, St. Louis, Mo. for defendants Frank, MH Center N. Redevelop. Corp., MH Center N. Redevelop. Co., MH Center Redevelopment Corp., MH Center Redevelop, MH Center S. Redevelop. Corp., MH Center S. Redevelopment Co., Remsco Management, Inc., Willowbrook Realty, Inc.

Maurice B. Frank, pro se.

Burton H. Shostak, Kramer, Chused, Shostak & Kohn, St. Louis, Mo., H. Laddie Montague, Jr., David Berger, P. A., Philadelphia, Pa. for Frank and all defendants except those added Sept. 1, 1977.

James F. Gunn, St. Louis, Mo., for limited partners added Sept. 1, 1977: Heftler, Ehrlich, Perry & Altman, MH Center N. Tower Redevelop. Corp., MH Center Tower Redevelop. Corp. & MH Center S. Tower Redevelopment Corp.

Lawrence Sanders, Trustee in Bankruptcy, Mansion House Motor Hotel Co., pro se.

Jerome W. Sidel, St. Louis, Mo., for Lawrence Sanders.

## MEMORANDUM

NANGLE, District Judge.

This matter is before the Court upon plaintiff's motion for partial summary judgment against defendant Maurice B. Frank. Plaintiff brought this suit as mortgagee of an apartment and motor hotel complex, consisting of three buildings owned by defendant-mortgagors, seeking a variety of relief to protect its interests therein. In Count II of the complaint, plaintiff alleges that the general partners of the mortgagor-partnerships are personally liable for funds coming into their hands which they are not entitled to keep, and for amounts owing for acts which they authorized in violation of the agreements between the parties herein. In the instant motion, plaintiff seeks to recover a money judgment against defendant Frank, individual general partner of each of the mortgagor-partnerships at the time of the alleged violations.

The record reveals the following: The Mansion House Center, an apartment and motor hotel complex, was constructed with proceeds of loans insured by the Secretary of Housing and Urban Development. The complex consists of three towers, referred to as the North, Center, and South Tower. Each tower is owned separately by limited partnerships known as Mansion House Center North Redevelopment Company, Mansion House Center Redevelopment Company and Mansion House Center South Redevelopment Company. Until July 30, 1976, defendant Frank was the sole individual general partner of each limited partnership; from and after that date, a dispute exists as to the compositions of the limited partnerships. In 1974, the South Tower was leased by its owner, Mansion House Center South Redevelopment Company, to another limited partnership, Mansion House Motor Hotel Company, for conversion into a motor hotel.

The Department of Housing and Urban Development has held the notes and deeds of trust on the complex since 1972. Incorporated into the deeds of trust are Regulatory Agreements which provide in part:

6. Owners shall not without prior written approval of the Commissioner:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property;

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from "surplus cash", except for reasonable operating expenses and necessary repairs;

.    .    .    .    .

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property of the project;

.    .    .    .    .

(e) Engage, except for natural persons, in any other business or activity, including the operation of other rental project, or incur any liability or obligation not in connection with the project;

.    .    .    .    .

9. (a) Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Commissioner. Upon such request, Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Commissioner for continuing proper management of the project.

.    .    .    .    .

(g) All rents and other receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of the agreement for expenses of the project or for distributions of surplus cash.

With reference to the conversion of the South Tower into a motor hotel, the record indicates that in 1974 HUD approved the plan involving the creation of a new limited partnership, Mansion House Motor Hotel Company. The Motor Hotel Company was to lease the South Tower and convert it for use as a Holiday Inn. Conversion of the South Tower was commenced by defendant Frank prior to HUD's approval of the plan, even though the Regulatory Agreements clearly state that the owners shall not remodel without prior written approval. The lease agreement between Mansion House Motor Hotel Company and the owner of the South Tower, Mansion House Center Redevelopment Company, provides in part:

SECTION 7. *Improvements, Repairs, Alterations*

(a) *Initial Improvements*: Tenant shall have the right, at its own expense, to make such improvements and alterations to the Premises as are appropriate for the operation of the Premises as a Holiday Inn; provided, however, that such improvements and alterations shall be subject to approval by Landlord and HUD and shall be in compliance with all applicable building codes and ordinances.

(b) *Other Improvements, Repairs, Upkeep and Replacements:* Except for the initial improvements, governed by subparagraph (a), improvements, repairs, upkeep, alterations and additions shall be governed under the following terms and conditions:

(1) Subject to approval by Landlord and HUD, Tenant shall have the right, at its own cost and expense, to construct on any part or all of the Premises, at any time and from time to time, such buildings, parking areas, driveways, walks, gardens and other similar and dissimilar improvements as Tenant shall from time to time determine, provided that the same shall be in compliance with all then applicable building codes and ordinances. The exterior and interior of any such constructed improvements shall be performed solely by the Tenant.

(2) Landlord shall, at all times during term of this lease, and at its own cost and expense, keep and maintain or cause to be kept and maintained in repair and good condition (ordinary wear and tear excepted), only the roof, foundation and the structural soundness of the walls of the buildings and improvements now erected on the premises. The terms "walls" as used herein shall not include windows, glass or plate glass, doors or store fronts. Tenant shall immediately give Landlord written notice of defect or need of repairs, after which Landlord shall have a reasonable opportunity to repair same or cure such defect. Landlord's liability hereunder shall be limited to the cost of such repairs or curing such defect. Landlord will maintain the

grounds around the buildings except that Tenant shall keep the Demised Premises in a clean and sanitary condition. Tenant shall at its own cost and expense repair and maintain all other parts of the premises, including, but not limited to, windows, glass and plate glass doors, store fronts, doors, interior walls and finishes, floors and floor coverings and shall take good care of the Demised Premises and its fixtures and suffer no waste.

(3) Subject to approval by the Landlord and HUD, Tenant shall have the right, at its own cost and expense, at any time and from time to time, to make such alterations, changes, replacements, improvements, and additions in and to the Premises, and the buildings and improvements thereon, as it may deem desirable.

On September 18, 1975, the Motor Hotel Company purchased furniture for twenty apartments which it leased in the Center Tower; cost for the furniture was $33,-944.19. In November, 1975, after HUD had disapproved the leases, the mortgagors, at the direction of defendant Frank and without HUD's prior written approval, assumed the obligation and used project funds to discharge the same. In the memorandum filed in opposition to the instant motion by defendant Frank, defendant does not refute, or make any mention of, the furniture expenditures.

The Mortgagors also assumed obligations of the Motor Hotel Company in the amount of $190,506.28 for carpet and carpet installation, and for painting, during the conversion of the South Tower into a motor hotel. This amount was reduced by $70,888.67 for architect's and engineer's fees and interest expenses. Accordingly, the mortgagors paid $119,617.91 from project funds to the Motor Hotel Company. On April 30, 1975, defendant Frank directed that the project also assume the architect's fees in the amount of $68,875.56 incurred in the conversion. From March 5, 1975 to August 28, 1975, an additional $23,973.52 in project funds was paid for architect's fees incurred in the conversion. On May 27, 1975, defendant Frank ordered payment from project funds of $9,690.77 for additional architect's fees, and $114,029.86 for general conversion costs. The projects only paid out $50,000.00 to the Motor Hotel Company; the balance was credited on June 2, 1976 against the sums then owing to the projects by the Motor Hotel Company.

These expenditures from project funds authorized by defendant Frank in connection with the conversion totalled $370,-131.81.

Defendant counters, in his memorandum in opposition, that the project funds spent for carpeting and carpet installation ·were spent prior to the closing of the hotel conversion agreement. Frank contends that HUD was aware of the work and was aware of the architectural work project for the funds expended. In support of the payment, defendant Frank

> contends herein that these costs may be interpreted as being either "incident" to the hotel conversion or relating to the *building* itself whether or not converted to hotel use. Certainly, standard maintenance projects would be the landlord's obligation. This is so in order to make the premises suitable for occupancy. Most of the South Tower was vacant for nearly five years previous to execution of the lease and upkeep and maintenance thereon had been minimal during that period. Defendant's Memorandum in Opposition, pp. 5–6 [emphasis in original].

Defendant Frank has also authorized expenditures for attorney's fees. Payment of $15,000.00 was made to Norman S. London at Frank's direction. The only evidence with reference to this fee is that Mr. London was retained because of a possible criminal investigation involving defendant Frank and the complex. Defendant Frank has not responded in his memorandum in opposition to this expenditure.

Fees in the amount of $10,000.00 were paid, at Frank's direction, to the firm of Friedman & Koven, for services rendered in connection with HUD's termination of the Third Modification Agreements between HUD and the mortgagor-partnerships; the mortgagor-partnerships' lawsuit against

HUD concerning the termination and also seeking to prevent foreclosure of the mortgages; and the suit entitled *Rodeway Inns of America, Inc. v. Frank,* No. 74–641 C (3) (E.D.Mo.1975), *aff'd,* 541 F.2d 759 (8th Cir. 1976), *cert. denied,* 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977), involving a challenge to the conversion of the South Tower. Defendant Frank states in his memorandum that the purpose of the payments is unclear. He further contends that if payments were for the defense of the South Partnership in the *Rodeway* suit, "this may have well been an expense which was a reasonable operating expense of the South Tower of the Mansion House Complex". Defendant's Memorandum in Opposition, pp. 2–3.

Project funds in the amount of $167,521.19 were paid, at Frank's direction, to the firm of Susman, Stern, Agatstein, Heifetz & Gallop, for services rendered in connection with the instant suit, the *Rodeway* suit, *supra,* the dispute with HUD over the termination of the Third Modification Agreements, and the claim by the mortgagor-partnerships challenging the termination and seeking to prevent foreclosure. Frank states, in his memorandum, that the government's evidence with regard to the identity of the services is insufficient to warrant any conclusion concerning their status as "reasonable operating expenses". He further states that

> . . . certain of the defendants in the *Rodeway* case could legitimately have their legal expenses in that case paid for out of project funds. No one would say that either of the general partners (or the Limited Partnerships themselves) who might have been sued in the normal course of business at the Mansion House would not have been allowed to legitimately use project funds to defend that lawsuit.

Lastly, $30,893.56 was paid from project funds at Frank's direction to the firm of Gunn & Gunn for services rendered almost exclusively in connection with the South Tower conversion. In defense of the expenditure of these funds, defendant Frank states:

It is certain that some of the money was used in connection with the legal services involved in the conversion of the South Tower from a residential apartment building into a motor hotel. It was certainly the burden of the South Partnership, if it wished to convert the South Tower into a motor hotel, to undertake the necessary finanacial [sic] and legal arrangement so that such a proposal could be turned into a fact. It is also true that all parties to the case herein agree that it was to the benefit of the public as taxpayers and to the Government itself that the South Tower be converted into a Holiday Inn. Had a private finanacial institution held the mortgage on the South Tower, there would be no question that the legal and financial expense involved in the preparation of and the actual consummation of the South Tower as a motor hotel would have been a legitimate and reasonable operating expense for the South Partnership. It is only when the Government is involved as the mortgage holder and a regulatory agreement (between the South Partnership which is the owner of the South Tower and the Government) is impressed onto the situation that the propriety and legitimacy of otherwise perfectly proper business-type expenses comes into issue.

On July 1, 1975, the Secretary exercised the right to terminate the management contract, as provided in the Regulatory Agreement. Accordingly, notice was sent to Remsco Management, Inc. and each mortgagor stating:

> The Department of Housing and Urban Development hereby terminates as of July 31, 1975, all Management Agreements currently in effect on the above three projects between the owners and Remsco Management, Inc.

Defendant Frank received this notice. Nevertheless, project funds in the amount of $151,268.53 were paid to Remsco for management fees from August 1, 1975 to July 30, 1976. In response, defendant Frank asserts:

. . . inspite [sic] of the fact that the regulatory agreements in effect at the time required that funds be withdrawn "only in accordance with the provisions of this agreement for expenses of the project", the managing agent of the project could not simply walk away from the project on August 1, 1975 and allow it to go unmanaged . . . . Defendant Frank states that he solicited a number of management and real estate agents in the St. Louis area and found none who were interested in taking over the management of the Mansion House Complex and who were acceptable to the Department of Housing and Urban Development. He and his company, Remsco Management, Inc. were under a duty to continue to manage the project, whatever that entailed, and to continue to take responsibility for all actions of the employees of the managing agent at the project. Under this situation and in spite of HUD commands to the contrary, we contend that it was proper for the project to continue to pay Remsco Management, Inc. and under the same terms as previously under the contract. Defendant's Memorandum in Opposition, pp. 1–2.

On February 25, 1975, at Frank's direction, $99,563.62 was paid from project funds to Willowbrook Realty, Inc. as a commission for the procurement of a lease of commercial space in the project. At this time, Remsco Management, Inc., wholly-owned and controlled by defendant Frank, was managing the complex and was obligated to procure leases of commercial space. Willowbrook Realty, Inc. was not licensed by the Missouri Real Estate Commission and did not have offices in St. Louis. The brokerage contract between Willowbrook Realty, Inc. and the mortgagors was not received until after the commercial space lease had been executed. Additionally, at the time that the contract was executed, Willowbrook Realty, Inc. had not yet come into existence. The payment of the brokerage fees was ordered by defendant Frank for services which Frank rendered, allegedly on behalf of Willowbrook, in obtaining the lease. Defendant Frank has not re-

sponded, in his memorandum in opposition, to plaintiff's contention that these payments were a sham and in violation of the Regulatory Agreements.

Lastly, plaintiff seeks to hold Frank liable for expenses paid from project funds for the remodeling of the Alumni Club Building and Salem Cafeteria and Bar in the Center Tower. These expenditures totaled $53,-870.61. The expenditures were made without the prior written approval of the Secretary. In response, defendant states that "the Government produces no documentation or proof that *any remodeling expenses were in fact incurred* or expenditures made. Without such proof, in a motion such as this, the Court is forced to disregard this particular allegation . . .". Defendant's Memorandum in Opposition, p. 6 [emphasis in original]. In connection with plaintiff's motion for appointment of a receiver, which motion was granted on September 8, 1976, the parties stipulated that the mortgagor-partnerships paid for the remodeling, at a total cost of $53,870.61, without seeking the proper approval of the Commissioner. *United States v. Mansion House Center,* 419 F.Supp. 85, 86 (E.D.Mo. 1976). In opposition, defendant Frank does not dispute that he authorized said expenditures; he only disputes that the expenditures were in fact made.

In *United States v. Thompson,* 272 F.Supp. 774 (E.D.Ark.1967), aff'd, 408 F.2d 1075 (8th Cir. 1969), plaintiff brought suit seeking to recover a money judgment against partners of a housing project for funds coming into the hands of the partners which they were not entitled to retain in accordance with the agreement between the parties. The court defined the term "operating expenses", as used in the agreements, as follows:

. . . it is a term which probably has no fixed, precise or inflexible meaning. Regard must be had to the context in which the term is used and to the nature of the business under consideration. In present context, the Court is convinced that the term must be construed with at least reasonable strictness and that the

concept of "operating expenses" should be limited to expenses paid or incurred in connection with the actual operation of the Summit House as a going concern. Capital expenditures should be excluded, of course, and the Court thinks that there should be excluded also expenses paid or incurred in connection with readying the project for operation.

. . . . .

The Court starts with the proposition that attorneys' fees may well be operating expenses of an apartment house project. Such a. project in the course of its day to day operations may require the services of counsel to collect rents, to evict tenants, or to prosecute and defend lawsuits growing out of the operation of the project. And fees paid for services of those types may properly be characterized as operating expenses of the project. . . . As has been stated, the services were in connection with the acquisition of the project by the partnership, receiving final approval and disbursement of the loan, and the settlement and elimination of lien claims so that the partnership would be in a position to operate the project. No one questions that valuable legal services were performed, and no one questions the reasonableness of the fees paid; but, those fees were simply not operating expenses, and their payment was forbidden by the regulatory agreement. *Id.* at 787–89.

It is the Court's conclusion that plaintiff's motion for partial summary judgment must be granted. The expenditures were authorized by defendant Frank, to be paid from project funds, for expenses that were not operating expenses, or were in clear violation of the Regulatory Agreements. In response to this motion, defendant Frank filed only a memorandum. He did not properly establish that any genuine issue exists. Rule 56(e), Federal Rules of Civil Procedure.

With reference to the $33,944.19 expended for furniture purchased by the Motor Hotel Company, defendant Frank has failed to raise any defense. The Court is totally unable to perceive how such an expenditure could be construed to constitute an operating expense and accordingly concludes that defendant Frank is personally liable for the same.

The expenditures for carpet, carpet installation, architect's fees and general conversion costs, authorized by defendant Frank from project funds on behalf of the Motor Hotel Company, were also improper. It makes no difference whether HUD was aware of the expenditures or whether HUD failed to require the Motor Hotel Company to reimburse the project for the funds. Defendant Frank, by virtue of the Regulatory Agreements, was obligated not to remodel any property without the prior written approval of HUD. Here, none was sought or obtained. Defendant's argument that the same may be considered as "incident" to the hotel conversion or relating to the building itself is totally without merit. The terms of the hotel conversion agreement clearly place the responsibility for these items upon the Motor Hotel Company. To view these as standard maintenance expense is also improper. Although the South Tower had been mostly vacant for a period of time, the Tower was not being renovated by the partnerships so that it could be used for residential purposes. These expenditures were made in connection with the conversion, and the conversion agreement places the burden for the same upon the Motor Hotel Company.

The payment of attorney's fees to Norman S. London in connection with a possible criminal investigation of defendant Frank was likewise improper. These fees can not possibly be considered operating expenses. Similarly, the Court concludes that none of the attorneys' fees were incurred "to collect rents, to evict tenants, or to prosecute and defend lawsuits growing out of the operation of the project". *Thompson, supra* at 789. Instead, the fees were incurred "so that the partnership would be in a position to operate the project". *Id.* Under these circumstances, the payment of the fees was not operating expenses and was forbidden.

Defendant Frank authorized payment to Remsco Management, Inc. for the period from August 1, 1975 to July 30, 1976 notwithstanding the fact that said manager had been discharged from the project on July 31, 1975 by HUD. While defendant may be correct in asserting that the complex was in need of a manager and could not go unmanaged, defendant acted in direct contradiction of HUD's command and thus in direct violation of the Regulatory Agreements. Accordingly, defendant is liable for the sums so expended.

The Court also concludes that defendant Frank should be liable for the sums paid to Willowbrook Realty, Inc. Defendant has not responded to plaintiff's assertion that these payments were sham and the Court is of the opinion that no other conclusion can be drawn under the circumstances. At the time, Willowbrook Realty had no agreement with the project; it had not yet even come into existence. Remsco was under an obligation to perform the services allegedly rendered by Willowbrook. The services were rendered by defendant Frank personally, allegedly on behalf of Willowbrook. In light of these circumstances, the Court concludes that the alleged services rendered by Willowbrook were, in fact, never performed by Willowbrook and that defendant Frank should be liable for the project funds expended.

The expenditures for the remodeling of the Alumni Club Building and Salem Cafeteria and Bar were in clear violation of the Regulatory Agreement. No prior written approval was sought and none was given. Defendant does not dispute that the expenditures were made at his direction and only contends, contrary to his prior stipulation in this Court, that no expenditures were in fact made. The prior stipulation of the parties establishes otherwise. Accordingly, defendant Frank will be held liable for said expenditures.

As noted by the Court of Appeals in *Thompson, supra,*

To interpret the language of the regulatory agreement to validate these withdrawals would deny the claim of the party having security in the assets of the project in favor of defaulting entrepreneurs who happened to have immediate control over the checkbook. 408 F.2d at 1080–81.

Accordingly, plaintiff will be granted partial summary judgment in the amount of $898,249.01.[1]

---

1. In its motion, plaintiff sought to recover the amount of $1,007,137.00. The Court has attempted to reconcile the figures but is unable to do so. According to the Court's calculations, the amount of $898,249.01 is the amount of liability herein.