## BANK OF HARTFORD *v.* McDONALD.

## Opinion delivered March 3, 1913.

1. CORPORATIONS—BANK—WHEN NOT BOUND BY OFFICERS' ACT.—S., the president of the plaintiff bank, in partnership with the other defendants, borrowed money from the bank, giving it their note. It was agreed among the partners that S. should handle the property purchased with the proceeds of the note, and should apply the rents and profits derived therefrom to the payment of the note. S. deposited such funds to his individual credit, in plaintiff's bank, and died without applying them as agreed. *Held,* the knowledge of S., the president, of the rights of the co-partners in the funds deposited can not be imputed to the bank to put the bank on notice that these were trust funds. (Page 240.)

2. CORPORATIONS—BANK—WHEN NOT BOUND BY ACT OF OFFICER.—When an officer of a bank is individually interested in a note or other matter, his knowledge is not to be imputed to the bank, when his acts conflict with the interests of the bank. (Page 240.)

3. CORPORATIONS—SAME—SAME.—A bank is not bound by the acts of its president, who makes a contract with himself against the interest of the bank. (Page 240.)

4. BANK—WITHDRAWAL OF TRUST FUNDS BY TRUSTEE.—A trustee with full control over trust funds in a bank may draw them out *ad libitum,* and the bank incurs no liability in permitting this to be done so long as it does not participate in any breach of trust resulting in a misapplication of the funds. (Page 241.)

Appeal from Sebastian Chancery Court, Greenwood District; *J. V. Bourland,* Chancellor; reversed.

### STATEMENT BY THE COURT.

This action was instituted by the Bank of Hartford to recover the sum of $2,141.66 upon a promissory note, executed on September 9, 1907, to the bank by appellees, A. A. McDonald, M. L. Croom and by one Joseph M. Spradling, who was the president of the bank, but died before the institution of the suit; and his administrator was made a party defendant. The note sued on was as follows:

"($2,141.66)     Hartford, Ark., Sept. 9, 1907.

Ninety days after date, without grace, we promise to pay to the Bank of Hartford, or order, at the banking house of said bank, in Hartford, Ark., for value received,

twenty-one hundred forty one and 66-100 dollars, with interest at the rate of ten per cent per annum from maturity until paid. The makers of this note hereby severally waive presentation for payment, notice of nonpayment, protest and consent that time of payment may be extended without notice thereof.

A. A. McDonald,

Jos. M. Spradling,

M. L. Croom."

In their answer, appellees admitted the execution of the note sued on, but they allege that said note was given for money loaned to them and Spradling for the purpose of buying certain real estate in the town of Hartford, in Sebastian County. They further alleged that at the time of said loan, Spradling was in entire charge of the business of the bank; and that it was agreed the title to the property should be taken in the name of Spradling and that he should have the right to rent, sell or otherwise dispose of it; and that any money derived from the property should be deposited in the bank for its protection; and that this money should be applied, first to the payment of the note sued on; second, to the discharge of a mortgage on said property; and, third, that the surplus, if any, less the expense of management, should be divided equally between the three makers of the note.

The property purchased belonged to the estate of Rogers and Stefani, which was being administered in bankruptcy at the time. Appellee McDonald was the attorney for certain claimants and filed the petition for the petitioning creditors and appellee Croom was the trustee in bankruptcy, and at this sale, Spradling was the purchaser, and the deed was made to him individually. The purchase price of the property was $7,000, and at the time of the sale, the property was incumbered by a mortgage to the Arkansas Valley Trust Company for $4,000 and interest. This mortgage was discharged and balance of purchase money paid out of the proceeds of the note in suit and a loan of $5,000 made by one John Goset, and secured by a mortgage on the property. This

mortgage in favor of Goset was foreclosed by a suit in the chancery court brought for that purpose and all of the property was sold and that sale was confirmed.

The testimony on the part of the appellees was to the effect that they had signed Spradling's note as sureties and that Spradling had complete control of the property and collected a considerable sum of money, and sold one of the lots for $500, of which $100 was cash, and that the balance of $400 of purchase money was evidenced by a note, which was assigned to the bank; and that Spradling deposited to his individual account all sums of money collected from the sale or rental of the property.

There appears to be no real question, but that as among the makers of the note, these were trust funds, but the real question is as to the bank's liability for their misuse. It appears that Spradling exercised considerable influence in shaping the policy of the bank and that his son was its cashier; and it appears further that appellees were not called upon to pay any interest on the note, until after Spradling's death. Neither the bank nor Spradling ever at any time rendered appellees any statement of this account, in fact, Spradling had but one account at the bank, and these funds were deposited as a part of his general account there. It is not contended that the bank was ever asked to furnish appellees any statement of the account, although Croom testified that Spradling told him that the property was bringing in a pretty fair income and that if he and McDonald desired, he would furnish them an itemized statement. This request was not made and the statement was not furnished.

The only proof of the bank's knowledge of the source of these funds and their intended use is the fact that Spradling was its president and gave its affairs his personal attention and appeared to have had much to do with its general policy and the fact that his son was the cashier, and the two letters written by McDonald to the bank which will be set out in full, and the bank's failure to require appellees to pay interest. McDonald under-

took to sell his interest in the deal to Spradling for $250, but Spradling refused to buy, but instead authorized the bank to make McDonald an individual loan. This note was not paid at its maturity and the bank wrote the following letter to McDonald:

"Hartford, Ark., November 21, 1908.
A. A. McDonald, Fort Smith, Ark.

Dear Sir: Having heard nothing from my notice sent you in regard to your past due note of $250, due December 30, 1907, will say I must insist on you letting me know, as I will proceed at once to collect same some other way.                    Respectfully,

J. L. S.

(Index.) Your credit at this bank will depend largely on the attention that note receives at maturity, which has not received any.

J. L. S."

And McDonald wrote the following letters to the bank:

November 21, 1908.
Bank of Hartford, Hartford, Ark.

Gentlemen: I am sorry that I did not receive your notice promptly, but have been absent from the office for several days.

I enclose check for $6.25 to pay interest on my note. Thanking you, I am,

Yours truly,

. . . . . . . . . . . . . . . . . . . . . .
November 28, 1908.
The Bank of Hartford, Hartford, Ark.

Gentlemen: Your letter of the 21st inst. with some name attached which I can not make out and which, in view of the relation existing and the explanation I made in my letter of the 21st inst., I consider rather insulting, is not understood, as I sent you check at that time for $6.25 to pay interest for ninety days; perhaps, however, I should have explained to you at that time that this loan was made with your Mr. J. M. Spradling, president

of your bank, with the understanding that he would carry it for me until the Stefani property was disposed of, unless something unforeseen happened, but on account of the relations between Mr. J. M. and Luther Spradling of your bank, I presume the matter was understood by all. As I notice your letter is dated November 21, I presume you have received my check since you wrote it.

Yours truly,

. . . . . . . . . . . . . . . . . . . . . .

These letters above referred to, which appellees say, in connection with the other evidence in the case, impute to the bank the knowledge that Spradling was handling trust funds and imposed upon it the duty of seeing that they were not misappropriated. It is not contended that Spradling's son, the cashier, had any knowledge of these transactions, except in so far as knowledge would be imputed to him from the above facts and such inferences as would arise from their existence. Upon the contrary, appellees admit that the note was executed at the office of McDonald in Fort Smith, and McDonald testified that when he received the bank's letter, set out above, dated November 21, 1908, he became angry and reminded Spradling that he had agreed to carry this individual note until this Stefani property had been disposed of, and that Spradling said, "You know it is not best for the kids to know everything sometimes," but that Spradling also said he had explained the situation to his son and there would be no further trouble about the interest, but that witness did not personally know what Spradling had told his son; and Croom testified that Spradling had told him and McDonald that his son had no knowledge of the conditions existing between them prior to this correspondence, but that he had then fully explained to his son the interest of the parties in the property. Croom testified that Spradling told him once at Hartford that he deposited the proceeds of the property to a separate account, and had a separate bank book, showing that fact; and that he thought the cashier was standing at the window when this conversation occurred, but

he does not appear to be certain of that fact and does not contend that the cashier participated in the conversation, nor does he say that the cashier overheard it, but he did admit that in this conversation nothing was said about any interest which he or McDonald had in the property, and he further admitted this was the only conversation he had ever had with Spradling about this money in the bank.  And Croom, like McDonald, admitted that Spradling had never been called upon to furnish, and had never furnished, either of them, any written statement of this account; and neither contend that they had ever had any conversation with any one connected with the bank except Spradling.  Upon the other hand, the cashier of the bank testified unequivocally that he had no notice of any understanding or agreement between his father and appellees that the bank should hold the proceeds of the property for the protection of the bank, and that there was no understanding that the proceeds should be applied to this note, but that his understanding was that the property belonged to his father, who was entitled to all the rents and that they were deposited to his father's private account; and that neither his father nor appellees ever had any partnership account at the bank.  Prior to Spradling's death, which occurred in July, 1909, there were only five directors of the bank, and the only two of these who testified said that they had no intimation that Spradling was not the sole owner of the property, and that the board of directors never in any way authorized Spradling to make the arrangement which appellees say he made.  The property was taken charge of by Spradling in March, 1907, and remained under his control until his death.

Various pleadings, which it will be unnecessary to discuss, were filed in the cause before the final decree was entered, but upon final hearing the court found that Spradling had taken the title to the property in trust for himself and appellees, and that the bank knew of this trust and knew that the deposits, although placed to Spradling's personal account, was a trust fund and

that in so crediting said fund it was misapplied, misappropriated and lost to the *cestui qui trust,* and that the bank knew of and participated in the misappropriation of said funds and that the bank is liable for the sum so misappropriated. There was a reference to a master, and on the coming in of his report the court charged the bank with all deposits made by Spradling on account of rents collected, and the part of the property which he sold, including the purchase money note for one of the lots, which he had assigned to the bank, and after allowing interest upon the note rendered judgment in favor of the bank for the balance.

At the time of Spradling's death, he had $988.27 on deposit in the bank, which was transferred to the account of his administrator on July 28, 1909.

*George W. Dodd,* for appellant.

1. An agent can not prostitute the name of his principal to serve his own personal ends. 65 Ark. 546. Spradling was a stranger to the bank.

2. Where an officer is individually interested in a note his knowledge is not to be imputed to his bank. 5 Cyc. 461 and note 22; 63 Ark. 418; 62 *Id.* 33; 65 *Id.* 546.

3. The rents were not trust funds, and the bank had notice. 10 Cyc. 1063; 5 *Id.* 461; 65 Ark. 543; 69 *Id.* 140; 98 Tex. 569; 141 S. W. 300.

*A. A. McDonald* and *M. S. Croom, pro se.*

1. The bank had knowledge of the trust and of its breach. 96 Ark. 163; 91 *Id.* 400.

2. The knowledge of the president and cashier is imputed to the bank. 77 Ark. 172; 8 Am. St. 632; 35 Conn. 93; 80 N. Y. 162; 70 Wis. 92; 2 Col. 565; 68 Ark. 299.

3. The rents were trust funds as the bank knew. 2 Am. St. 600; 12 A. & E. Cas. 666; 68 Ark. 71; 69 *Id.* 43; 84 *Id.* 189; 92 *Id.* 55.

4. The findings of the master are conclusive unless clearly against the evidence. 92 Ark. 41; *Ib.* 359; 96 *Id.* 354.

SMITH, J., (after stating the facts).    Pretermitting a decision upon the competency of the evidence herein detailed and to which there were a number of objections, we are of opinion that the evidence is not sufficient to charge the bank with liability for the misappropriation of these funds.    Except the correspondence, above set out, there is no proof that any officer of the bank, except the president, knew anything about the interest of appellees in the property and the rents and proceeds of the sale thereof and this correspondence is insufficient to charge it with such notice as would make it liable for any misappropriation.    It does not advise the bank of their interest in the land and does not request that it hold the funds for their protection.    The bank under these circumstances can not be charged with Spradling's knowledge nor be required to perform his agreements.

In these transactions, Spradling was a stranger to the bank, although its president, for the law does not allow the president of the bank to make contracts with himself, against the interest of the bank, so as to bind the bank, because the weakness of human nature and the probability of the agent giving himself the advantage of the bargain is recognized.

In the case of *City Electric Street Ry. Co.* v. *First National Bank*, 65 Ark. 543, where a question similar to the one here considered was involved, the court said: "The contention of counsel on this point is plausible, but underlying it, there is the fallacy that in negotiating the notes in question the action of Allis was the action of the bank.    Allis was the president of the bank, it is true, but he was also payee of the notes, and he was personally interested in their negotiation.    This of itself made him a stranger to the bank, so far as the handling of these notes was concerned.    An agent can not prostitute the name of his principal to the service of his own personal ends, and this rule applies with full force to the official of a corporation in making use of the corporate name."    It is not contended here that the bank was a trustee nor is it said that it derived any benefit from the

misappropriation of the funds. Spradling had the title in trust for the benefit of himself and his copartners, and his control of the property and his right to dispose of it was without limitation, except the duty of finally accounting to appellees for his stewardship, and his knowledge of the rights of his copartners can not be imputed to the bank for the rule is that where an officer is individually interested in a note or other matter his knowledge is not to be imputed to his bank, since his interest is best served by concealing it. 5 Cyc. 461, and note 22; *City Street Ry.* v. *First National Bank, supra; Home Ins. Co.* v. *North Little Rock Ice & Electric Co.,* 86 Ark. 538; *Klein* v. *German Nat. Bank,* 69 Ark. 140; *City Street Ry.* v. *First Nat. Bank,* 62 Ark. 33.

There was no relation of trust between Spradling and the bank, there was no obligation to deposit the funds in this particular bank, and Spradling could without question have deposited them in any other bank. The appellant bank had no interest whatever in the property and derived no benefit from the venture and was in no way responsible for its success or failure, and it has been held that where a trustee has full control over the funds deposited in a bank, he may draw them out of the bank *ad libitum,* and the bank incurs no liability in permitting this to be done, so long as it does not participate in the breach of trust, resulting in a misapplication of the funds. *First State Bank of Bonham* v. *Hill,* 141 S. W. 300; *Interstate Bank* v. *Claxton,* 80 S. W. 604, 65 L. R. A. 820.

Appellee insists that if it were conceded that the president of the bank alone knew of the agreement this knowledge would be imputed to the bank and would bind it and make it liable for any misappropriations of the funds, and cites in support of that proposition the case of *Skillern* v. *Arkansas Woolen Mills,* reported in 77 Ark. at page 172. The facts in that case were that the Woolen Mills Company owned a mill and leased its entire plant to one D. P. Terry, who was the cashier and managing officer of a bank, and two others, and these

lessees took possession of the mill and operated it in the name of the lessor, but for their own personal benefit. They kept an account with the bank in the name of the lessor and transacted their business in its name. They overdrew the amount of their credit and at the instance of Terry, one of the lessees, and the cashier of the bank, and without authority of the mills company executed the note sued on by Skillern, the receiver of the bank, and it was there held that the bank, through its cashier and managing officer, had notice of the foregoing facts as they occurred, and was not misled, and that the mills company was not estopped from taking advantage of them. This is a full statement of the effect of that decision and, in our opinion, there is nothing there decided that gives support to appellees' contention under the facts here shown to exist.

Appellees cite cases to the effect that if a bank learns that a trustee is committing a breach of trust by an improper withdrawal of funds, or participates in the fraud, it is liable and that where a deposit of trust funds is made by a trustee in his own name with the knowledge of the depositing bank that such deposit is wrongful, the bank is liable to the *cestui qui trust* upon the trustee's withdrawing and converting the funds and among other cases cited are *Carroll County Bank* v. *Rhodes,* 69 Ark. 43; and *Boone County Bank* v. *Byrum,* 68 Ark. 71. In the Byrum case the facts were that the bank knew the funds deposited with it had been derived from the collection of taxes and that the money belonged to the State, yet it appropriated it to the payment of an individual indebtedness of the collector due it, and it was there held that the sureties on the collector's bond, who paid the State the amount misappropriated by the collector were entitled as against the bank to be subrogated to the State's right to the deposit. In the Rhodes case, *supra,* a county collector deposited in the bank money collected for the State, and drew a check to pay a debt due by him to the bank, and the bank knew that the money belonged to the State, and it was held that the bank will be liable

to the State for the money so appropriated; and in that case Judge BATTLE, speaking for the court, said: "When money is placed as a general deposit in a bank, it is no longer the property of the depositor, but immediately becomes the money of the bank. The depositor becomes the creditor of the bank, and the bank his debtor; and the bank is bound by an implied contract to honor the checks of the depositor to the extent of his deposit. When his checks are drawn in proper form, the bank is bound to honor them. It can not excuse a refusal to pay them by showing that it had reason to believe that the checks were given for an unlawful purpose, or that other persons had liens or claims on the money deposited. But there is an exception to this rule. If the banker has notice that the fund does not belong to the depositor and the check is drawn to pay a debt due the bank, then the banker would be affected with a knowledge of the unlawful intent, and would be in duty bound to dishonor the check, and, if he did not do so, would be a participant in the profits of the fraud, and liable to the owner of the fund for all moneys appropriated to its payment."

But we have shown that the bank had no knowledge that this was a trust fund, and, moreover, it would not come within the exception above mentioned for the reason that it did not participate in and was not a beneficiary in any misappropriation.

Accordingly the decree of the chancellor is reversed and the cause remanded with directions to enter up a judgment against all the defendants in this cause for the amount of the note and interest.