## R. S. MISKIMINS
*v.*

## THE CITY NATIONAL BANK
### OF FORT SMITH,
### ARKANSAS

5-5011

456 S. W. 2d 673

Opinion delivered June 29, 1970

*Bethell, Stocks, Callaway & King,* for appellant.

*Thomas Harper* and *Don A. Smith,* for appellee.

JOHN A. FOGLEMAN, Justice. The summary judgment appealed from in this case was rendered in a suit by appellee against appellant seeking a declaration of appellee's rights and appellant's liability for a $9,000 balance remaining unpaid on a $25,000 loan. Appellant borrowed the money to pay for stock in Investors Thrift Corporation (hereinafter referred to as ITC), and used it for that purpose. The proceeds of the sale of .stock by ITC were to be used in the purchase of stock of American Home Builders, Inc., (hereinafter called AHB), which in turn owned the controlling stock in Peoples Loan and Investment Company (hereinafter called PLI) and other corporations. Appellant pledged 100,000 shares of the capital stock of ITC as sole security for the loan. It was made on October 29, 1965, and was payable in installments of $5,000 in June 1966, $10,000 in June 1967 and $10,000 in June 1968. Appellant filed an answer and counterclaim alleging that a vice-president of appellee had worked out a fraudulent scheme whereby appellant, with others, would purchase the stock of AHB, one-third of which was owned by the vice-president, with funds borrowed from appellee. He alleged that appellee knew, or should have known, that it was participating in a scheme

whereby appellant would purchase stock in an insolvent corporation.

Appellant filed a motion for leave to file a cross complaint against additional cross defendants. There is nothing in the transcript before us to indicate that the court ever granted permission to appellant to file this pleading. In the transcript there appears a pleading which is unsigned but bears an endorsement of the clerk of the trial court indicating that it had been filed.

After appellee filed its motion for summary judgment, its attorney wrote the circuit judge with reference to the appellant's motion saying:

A review of this file indicates there is pending a motion by defendant for leave to file a cross complaint which defendant's counsel states "could better be styled cross complaint and amended counterclaim."

We are compelled to reject the contention by appellee that this pleading was not before the court for consideration on the motion for summary judgment. While appellee is correct in its statement that the record fails to show that the trial court ever ruled on the motion for leave to file the cross complaint, the pleading, as to appellee, did constitute, in effect, an amended counterclaim and appellee's supplemental motion for summary judgment incorporated "the cross complaint or amended counterclaim filed herein by defendant with motion for leave to file same." The judgment of the trial court refers to appellee's motion as one "for a summary judgment granting the relief prayed in plaintiff's complaint and dismissing defendant's amended counterclaim against the plaintiff." Incorporated in this judgment is a finding that appellee's motion for summary judgment granting the relief prayed in its complaint and "dismissing defendant's counterclaim, as amended, should be granted." There is a further finding that appellee was entitled to the relief prayed in its complaint and to a dismissal of the defendant's coun-

terclaim, as amended. It was adjudged that appellant should "take nothing on his counterclaim."

In this amended counterclaim, Miskimins alleged that the bank, through its officers and agents, represented to him or his representative that the net worth of AHB, exclusive of the value of PLI stock owned by a subsidiary, was at least $340,000, that PLI had the capacity to buy all mortgages that AHB could produce, that controlling interest in PLI was worth an additional $1,000,000, that AHB was producing a net profit of at least $1,500 per house sold, that AHB and its subsidiaries were producing and selling 350 houses per year at a net profit of $525,000 per year, and that both PLI and AHB with its subsidiary corporations were highly profitable, financially sound, going businesses. He asserted that he obtained the loans involved, in reliance upon these representations, in order to make an additional investment in ITC. He alleged that he had invested $107,625 of a total of approximately $947,300 of capital for the purchase of stock of AHB by ITC and had authorized Markham to enter into a contract to purchase such stock. Miskimins further alleged that he came to Fort Smith to obtain loans for additional investment in ITC, in order to enable that corporation to make deferred payments on the contract of purchase as they became due, a part of which were for the purpose of retiring indebtedness of AHB, partially guaranteed by Hall. According to this pleading, Miskimins applied to appellee for the loan because he had been advised by Markham that this bank would readily make the loan. Miskimins charged that the bank represented to him that the purchase being made was a good investment, although it knew or should have known that the purchaser of the stock had been provided with false or misleading information, in order to insure continuity of business with PLI and AHB. He further alleged that appellee aided and abetted Sexton, Hall, Smith and Gatlin in employing a manipulative scheme and artifice to defraud him in violation of Rule 10b-5 promulgated by the Securities and Exchange Commission.

The transcript in this case consists of some 600 pages, and the briefs contain a total of 315 pages. For the purposes of this opinion, we will view the supporting and controverting affidavits, depositions and admissions in the light most favorable to appellant, as it is our duty to do.

The series of complicated transactions leading up to the loan made by the appellee to appellant commenced some time in 1965. One Maurice W. Markham, Jr., who had practiced as a veterinarian in Platte, South Dakota, had established a concern called Markham Homes, Inc., which was engaged in building shell homes in the northeast Oklahoma area. When the capital of this corporation became tied up in shell home financing, its mortgages were sold to savings and loan associations in areas in which the homes were built. Markham discontinued his veterinary practice and moved to Pryor, Oklahoma, where the corporation opened a lumber yard and continued building houses. A search for outlets for mortgages on shell homes revealed information about Peoples Loan and Investment Company of Fort Smith, which had bought numerous mortgages from AHB, a concern which was also in the shell home business. AHB was owned by Jim Hall, Executive Vice-President of appellee, Huie Smith and Sam Sexton, Jr., each owning one-third of the outstanding capital stock. Markham then contacted one Austin Gatlin of Mountainburg, who had formed PLI. Gatlin informed him that he had sold PLI to AHB and had subsequently established Arkansas Loan and Thrift Corporation in Van Buren. Gatlin advised the formation of an institution identical with Arkansas Loan and Thrift Corporation for the financing of shell homes. Markham then employed Gatlin to set up such a corporation and to render advisory services to it for a period of one year. Gatlin indicated that he was in contact with numerous investors who would buy stock in such a corporation. It was contemplated that certain investors in South Dakota would also take stock and Gatlin agreed with Markham to go there to talk with them.

The first meeting of the incorporators of Investors Thrift Corporation was held at the Diamond G Ranch, owned by Gatlin and his wife, at Mountainburg, Arkansas, on August 10, 1965. Appellant was represented at this meeting by his proxy, Markham. His subscription was shown to be for 100,000 shares of class A stock. Markham and Gatlin were two of the three directors elected. While Gatlin was transacting business in the PLI offices on some date after his employment by Markham, Sexton asked Gatlin if he thought Markham would be interested in buying AHB. Gatlin promised to determine whether Markham was interested. After a trip to South Dakota, Markham expressed interest but did not want to buy AHB without also acquiring the control of PLI. On September 9, 1965, Hall, Smith and Sexton granted an option to ITC and Markham to purchase all of the shares of stock of AHB. Sexton had offered Gatlin $50,000 to sell AHB. Gatlin said that he advised Markham of that fact. Sexton had written a letter to Gatlin, dated August 3, 1965, regarding the condition of AHB, which was delivered to Markham.

The agreement for sale required the payment of $150,000 in cash for an option to purchase and $157,500 on or before January 10, 1966, if the option was exercised. It also required the payment of $300,000 to Texas Capital Corporation by the same date and an additional $400,000 (or such lesser sum as might be due from AHB) before June 30, 1966. ITC was granted full access to the books and records of AHB, PLI and all subsidiaries under the agreement. The cash payment was to be forfeited as consideration for the contract if the option was not exercised.[1]

Markham became general manager of AHB, at least nominally, on the date of the contract. Sexton and Gatlin managed PLI, at least until the option was

---

[1] It seems to have been contemplated that only $50,000 in cash was to be paid. The balance was in the form of stock which was to go to Gatlin and Markham for commissions or "bonuses."

exercised on November 2, 1965. It appears that Sexton did not actually leave until November 8. Thereafter, the management was vested in Markham and Gatlin, with the latter serving as a consultant until February 6, 1966, according to his agreement.

Soon after the contract was entered into, Markham discovered that the requirements made by Texas Capital were in excess of those set out in the option. These requirements were finally set out in a letter of November 1. Texas Capital, to whom the corporation stock to be transferred was pledged, expected that at least $400,000 be paid promptly, and at least $150,000 by January 1, 1966, and an additional $115,583.27 by June 30, 1966, with interest to be added.

Both Gatlin and Smith began to urge Markham to close the deal quickly to remove Sexton from the management of PLI. Gatlin insisted that if they waited until January 10, Sexton would substantially impair the value of PLI. Smith advised the purchasers that he would invest $45,000 of the $50,000 he was to receive in ITC stock if Sexton were out of the business. As a result, Markham urged his principals to expedite the matter. The option was exercised November 2, and the balance required was paid to the sellers on November 5, when $400,000 was also paid to Texas Capital. The purchasers paid the full balance to that corporation by January 10, 1966.

It was necessary that Miskimins and his associates borrow money in order to make the cash payments required. Miskimins stated that the loans involved in this litigation were obtained in order to acquire the funds that he used to purchase ITC stock, and thus provide his contribution to the amount of capital required to consummate the purchase. Hall had advised Smoot, the president, and Greathouse, another officer of appellee, that these purchasers would probably ask for loans in connection with the transaction. All transactions of appellant and his associates with the bank were handled by officers other than Hall, its vice-presi-

dent. Hall had advised Smoot that he had a personal interest in the sale. Smoot, Greathouse, Hall and six others constituted appellee's discount committee. The loans to appellant were made by Smoot and approved by this committee.

Sexton stated that he understood that PLI had the largest single deposit in City National Bank. Appellee extended credit from time to time in order that cash reserve requirements of PLI be maintained. According to Sexton, both AHB and PLI regularly furnished their financial statements to the bank and used them as a credit reference.

Miskimins and his associates came to Fort Smith on October 29, 1965, to borrow money so that they could buy enough additional stock in ITC to enable it to exercise the purchase option. They went to the bank and met Hall and Smoot in the coffee shop there. An informal discussion of their desire for a loan and the purposes thereof ensued. Although Smoot denied that he was aware that the borrowed funds were to be used to purchase stocks from Hall or to relieve Hall of any obligation, he admitted that he had conversations with appellant and the other borrowers with reference to the loans and that he understood from Miskimins that the loan was to purchase stock in ITC. He also admitted that Hall had advised him and other officers of the bank that he would not participate in matters pertaining to these loans because of his personal interest. Smoot also stated, in answer to interrogatories, that he considered the financial condition of PLI to be good and that the financial condition of AHB was good, as far as he knew. A finding that Smoot knew that the purposes of the loan were to enable ITC to complete the purchase of PLI and AHB would be justified.

Appellant's affidavit relates his version of the discussion, as follows:

  * * * There a general discussion of the proposed

> purchase. of American Home Builders, Inc., with its control of Peoples Loan and Investment Company and related organizations took place. The financial soundness of both American Home Builders, Inc., and Peoples Loan and Investment Company was discussed, as well as the profitability of the businesses. We were assured by Mr. Hall in the presence of Mr. Smoot that both businesses were financially sound and highly profitable going businesses and we were encouraged by both Mr. Hall and Mr. Smoot to proceed with the investment. Mr. Smoot definitely knew of Mr. Hall's stock ownership in American Home Builders, Inc., and was completely aware of the fact that the funds which I and the other South Dakota investors were borrowing from The City National Bank were to be used by Investors Thrift Corporation to purchase American Home Builders, Inc. stock, with its related corporations.

The same statement was contained in the affidavit of five of Miskimins' associates in ITC.

> Sexton stated that, to the best of his knowledge and belief, Markham, as general manager of AHB, had possession of its books and records at all times after September 9, 1965. He said that on September 2, when the first draft of a contract was presented, PLI was being audited by the Arthur Anderson Company. He revealed that no changes in the books or accounts of the company were made when this audit was completed. Sexton knew that Markham did not inspect the books of the companies, but said that Markham had one Jimmy Willis examine the books at AHB and had his sister look at the books of PLI at one time or another.

> In a deposition, Gatlin testified that the basic asset of PLI was about $6,000,000 in loans and mortgages which he said could not have been evaluated in a short period of time. He said that he was unable to evaluate these loans during the time he remained at PLI. In

early September, Markham had a certified public accountant make a preliminary survey of PLI on behalf of Markham Homes. This accountant advised that, with the personnel available to his company, at least six months would be required for it to complete an audit. He estimated that a minimum of three months would be required for such an audit, regardless of the number of persons who could be employed.

Various errors in the assets and liabilities accounts of AHB and PLI began to appear in early 1966. About July 1, 1966, Ronnie Butler, a public accountant having five years' experience with a national firm of certified public accountants was employed by AHB to make an audit. On September 1, 1966, he moved to PLI and devoted his time to an audit there. He continued to find errors in the liabilities and repossession accounts of AHB through 1967. His audit was completed in October of that year. It disclosed that there was no substantial change in the net worth of PLI between January 30, 1965, and September 30, 1965. He found AHB to have a net deficit of $537,253.18 on September 30, 1965. The PLI deficit was $31,152.41 on June 30, 1965. According to Markham, the full nature and extent of the misrepresentations made about these corporations were not known to him or those he represented until the fall of 1967. As irregularities continued to appear, a meeting of the stockholders of ITC was held in South Dakota, where most of them resided, in May 1967. Thereafter the accounting firm of Fred Landau of Chicago was employed and an audit completed in the fall of 1967. Markham stated that it took almost two years to unravel the complicated, false and misleading transactions involved.

The allegation of appellant that AHB and PLI were insolvent at the time he obtained the loans involved is not controverted.

Appellant hinges his argument for reversal upon the existence of a genuine issue of material fact as to his right to relief for legal or constructive fraud and

for violation of SEC Rule 10b-5. We shall first discuss the cause of action for legal or constructive fraud. We feel that no discussion of any possible cause of action for actual fraud is warranted. In the first place, we find no support for such a cause and, in the second place, appellant seems to have abandoned this basis for relief.

We have clearly recognized long ago that there may be a cause of action for legal, or constructive fraud, even though there is a complete absence of any moral wrong or evil intention. *Stewart* v. *Clark,* 195 Ark. 943, 115 S. W. 2d 887. This type of fraud is based upon a breach of a legal or equitable duty which the law declares to be fraudulent because of its tendency to deceive others, regardless of the moral guilt, purpose or intent of the fraud feasor. *Lane* v. *Rachel,* 239 Ark. 400, 389 S. W. 2d 621; *Levinson* v. *Treadway,* 190 Ark. 201, 78 S. W. 2d 59; *Bridges* v. *United Savings Association,* 246 Ark. 221, 438 S. W. 2d 303. Representations are considered to be fraudulent when made by one who either knows them to be false, or, not knowing, asserts them to be true. *Fausett & Co.* v. *Bullard,* 217 Ark. 176, 229 S. W. 2d 490; *Maurice* v. *Chaffin,* 219 Ark. 273, 241 S. W. 2d 257. It may involve a mere mistake of fact. *Kersh Lake Drainage District* v. *Johnson,* 203 Ark. 315, 157 S. W. 2d 39.

Of course, the burden of demonstrating that there is no justiciable fact issue rests, in the first instance, upon the party moving for summary judgment. *Evers* v. *Guaranty Investment Co.,* 244 Ark. 925, 428 S. W. 2d 68; *Widmer* v. *Ford Tractor Co.,* 244 Ark. 696, 426 S. W. 2d 806; *United Press International, Inc.* v. *Heinreich,* 241 Ark. 36, 406 S. W. 2d 317. Doubts must be resolved against the motion. *Bull* v. *Manning,* 245 Ark. 552, 433 S. W. 2d 145; *Bergetz* v. *Repka,* 244 Ark. 60, 424 S. W. 2d 367; *Griffin* v. *Monsanto Co.* 240 Ark. 420, 400 S. W. 2d 492. Yet, when the movant makes a prima facie showing of entitlement to the relief sought, the respondent must remove the shielding cloak of

formal allegations and demonstrate a genuine issue as to a material fact. *Mid-South Ins. Co.* v. *First National Bank of Fort Smith,* 241 Ark. 935, 410 S. W. 2d 873; *Deam* v. *O. L. Puryear & Sons, Inc.,* 244 Ark. 18, 423 S. W. 2d 554. In order to do this, opposing affidavits must set forth facts which would be admissible in evidence. The response and supporting material must set forth specific facts showing that there is a genuine issue for trial. Ark. Stat. Ann. § 29-211(e) (Supp. 1969). The affidavit is not sufficient if it states only conclusions. The appropriate rule is stated at 49 C. J. S. 414, Judgments § 225 (1947), as follows:

> The statements made, whether adduced in support of, or in opposition to, the motion for summary judgment, must be statements of fact, and not mere conclusions, opinions, or beliefs. * * * The affidavits should set forth evidentiary and not ultimate facts, and should set forth the facts with particularity, mere general averments being insufficient. However, the affidavit need not be composed wholly of strictly evidentiary facts, and an affiant is not required to aver as a fact that which is not a fact, but an opinion.

For some of the cases supporting this rule, see *Salitan* v. *Tinkham,* 103 N. H. 100, 166 A. 2d 115 (1960); *Wanous* v. *Balaco,* 412 Ill. 545, 107 N. E. 2d 791 (1952); *Gherardi* v. *Board of Education of the City of Trenton,* 53 N. J. Super. 349, 147 A. 2d 535 (1958); *Bennett* v. *Kazvini,* 120 N. Y. S. 2d 229 (1952); *Humboldt Livestock Auction Co., Inc.* v. *B & H Cattle Co.,* 261 Iowa 419, 155 N. W. 2d 478 (1967); *Engelhard Industries, Inc.* v. *Research Instrumental Corp.,* 324 F. 2d 347 (1963), cert. denied, 377 U. S. 923, 84 S. Ct. 1220, 12 L. Ed. 2d 215 (1964).

Appellant cannot rely upon the statements and representations of Hall, because the bank cannot be charged with them, or with his knowledge, because of his known individual interest in the transaction, and the absence of any indication that he was the sole

manager or the dominating influence in its affairs. *Futrall* v. *McKennon,* 187 Ark. 374, 59 S. W. 2d 1035; *Greer* v. *Levee District No. 3 of Conway County,* 140 Ark. 60, 215 S. W. 171; *Bank of Hartford* v. *McDonald,* 107 Ark. 232, 154 S. W. 512. See also 10 Am. Jur. 2d 153 and 155, Banks, §§ 163 and 167. Therefore, appellant can only demonstrate that there was a genuine fact issue, insofar as he is concerned, from the affidavits concerning the "coffee shop" conference.

When we consider the Miskimins affidavit in this light, we are unable to say that he demonstrated a genuine fact issue as to legal or constructive fraud by setting forth specific facts which would be admissible in evidence. The only statement of Miskimins relating to Smoot is that "* * * we were encouraged by both Mr. Hall and Mr. Smoot to proceed with the investment."

The generality of this statement is such that it cannot be classified as the statement of a specific fact or as admissible in evidence. In reaching this conclusion, we find nothing in the affidavit which would indicate that Smoot had, at the most, stated anything more than the expression of opinion. Such a statement cannot furnish the basis of a cause of action for legal or constructive fraud. *Cannaday* v. *Cossey,* 228 Ark. 1119, 312 S. W. 2d 442. Thus, the opposing affidavit cannot be said to indicate that there was any representation made by Smoot. It must be recalled that no audit or financial statement, which had been furnished to the bank, had disclosed any of the irregularities later discovered.[2]

We consider appellant's argument that he is entitled to relief under Rule 10b-5, Title 17, § 240.10b-5, page 334, Code of Federal Regulations, to be without merit, for want of standing to assert a cause of action

[2]We note that it was found in a companion case that there was no proof that Smoot made any representations as to the financial condition of AHB and PLI. See *City National Bank of Fort Smith* v. *Vanderboom,* 290 F. Supp. 592, (W. D. Ark. 1968), aff'd, 422 F. 2d 221 (8th Cir. 1970)  ·

thereunder. *City National Bank of Fort Smith* v. *Vanderboom,* 290 F. Supp. 592 (W. D. Ark. 1968), aff'd, 422 F. 2d 221 (8th Cir. 1970).

The judgment is affirmed.