**INVESTORS THRIFT CORPORATION, Appellant,**

v.

**Sam SEXTON, Jr., et al., Appellees and Cross-Appellants.**

**Nos. 73-1117, 73-1141 and 73-1165.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1973.

Decided Feb. 4, 1974.

Rehearings and Rehearings En Banc Denied March 12, 1974.

William M. Stocks, Fort Smith, Ark., for Investors.

Philip S. Anderson, Little Rock, Ark., for James Hall.

Don A. Smith, Fort Smith, Ark., for Gatlin.

Before HEANEY, ROSS and STEPHENSON, Circuit Judges.

ROSS, Circuit Judge.

Investors Thrift Corporation (ITC) appeals from an adverse jury verdict in a case wherein ITC was the plaintiff and Sam Sexton, Jr., James S. Hall, and Josephine W. Ramey, Administratrix of the estate of Austin Gatlin, were defendants.

After protracted litigation refined the issues,[1] the jury, in this case, was asked to decide whether the defendants, by fraudulent misrepresentations, induced the plaintiff to purchase all of the stock in American Home Builders, Inc. (AHB). AHB controlled a number of other companies including Peoples Loan and Investment Company (PL&I). Essentially, ITC contended that the defendants had falsely misrepresented the value of AHB's stock and the value of AHB and PL&I. Maurice Markham, ITC's president, was the moving force behind ITC's acquisition of AHB and PL&I. ITC acquired an option to purchase these companies in early September of 1965, and the option was exercised in early November of 1965.

ITC asserts, among numerous other grounds allegedly requiring reversal, that it was unfairly prejudiced by the trial court's Instruction 12 relating to "time of loss" and by the admission of certain evidence relating to "time of loss." Finding these arguments to be meritorious, we reverse and remand for a new trial.[2]

*Instruction 12.*

The district court instructed the jury that:

Even though you may find that the plaintiff, [ITC], suffered a financial loss in the *operation* of [AHB] and [PL&I], if you further find that the loss was proximately caused by any factor other than the false representa-

---

1. For related cases *see* Vanderboom v. Sexton, 460 F.2d 362 (8th Cir. 1972); Investors Thrift Corp. v. Sexton, 347 F.Supp. 1207 (W.D.Ark.1972); In re Peoples Loan & Inv. Co., 316 F.Supp. 13 (W.D.Ark.1970); Vanderboom v. Sexton, 294 F.Supp. 1178 (W.D.Ark.1969), rev'd, 422 F.2d 1233 (8th Cir.), cert. denied, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970); In re Peoples Loan & Inv. Co., 292 F.Supp. 594 (W.D.Ark. 1968), rev'd, 410 F.2d 851 (8th Cir. 1969); City Nat'l Bank v. Vanderboom, 290 F.Supp. 592 (W.D.Ark.1968), aff'd, 422 F.2d 221 (8th Cir.), cert. denied, 399 U.S. 905, 90 S. Ct. 2196, 26 L.Ed.2d 560 (1970); Miskimins v. City Nat'l Bank, 248 Ark. 1194, 456 S.W. 2d 673 (1970).

2. Since a new trial is required because of the "time of loss" question, we need not decide

any of the other questions raised by ITC. Although we do not decide the question, we commend to the district court's attention on remand the following decisions with respect to the applicable burden of proof. Jeffers v. Brown Motor Co., 490 S.W.2d 803, 806 (Ark.1973); Ray Dodge Inc. v. Moore, 251 Ark. 1036, 479 S.W.2d 518, 521 (1972); Killian v. Hayes Bros. Lbr. Co., Inc., 251 Ark. 121, 470 S.W.2d 939, 940 (1971); Clay v. Brand, 236 Ark. 236, 365 S.W.2d 256, 259–260 (1963). The defendants in this case have filed a cross-appeal, claiming essentially that ITC failed to adduce sufficient proof to make a submissible case. We find here, as we did in Vanderboom v. Sexton, *supra*, 460 F.2d at 366, that there was a jury question presented.

tions, if any, made by the defendants, you cannot find a verdict for the plaintiff but must return a verdict for the defendants.

. . . . . . .

(Emphasis supplied.)

In Instruction 13, the court instructed that: "Ordinarily the plaintiff would be entitled to recover the difference between the actual value of the stock *at the time the option to purchase was exercised,* and the price the defendants actually received for the stock. . . ." (Emphasis supplied.)

Objection is made to Instruction 12 on the grounds that it improperly focuses the jury's attention on the wrong point in time in determining the value of the stock, and, in addition, incorrectly states, in essence, that if ITC aggravated its losses it is not entitled to any damages, regardless of the fact that some portion of the damages may have come about as the proximate cause of the ·fraud, and not the aggravation of the initial loss.

 It is clear that Arkansas requires, as do most jurisdictions, that value be determined as of the time of the sale of the stock.[3] McDonough v. Williams, 77 Ark. 261, 92 S.W. 783, 786 (1905). *See generally,* H. McGregor, McGregor on Damages § 1366 at 911–912 (1972). C. McCormick, McCormick on Damages § 122 at 455–458 (1935); 4 J. Sutherland, A Treatise on the Law of Damages § 1172 at 4408–4409 (1916). Therefore, to the extent Instruction 12 focused the jury's attention on a time subsequent to the sale of the stock, the instruction was erroneous.

We think it clear that Instruction 12, speaking as it did of "loss in the operation," tended to focus the jury's attention, for the purpose of determining value, on a time subsequent to the sale of the stock. Although Instruction 13 properly defined the time for determining the value of the stock, the jury could have been confused by the qualifying words of Instruction 12. In effect, Instruction 12 indicates that if the jury does find an operations loss, but the operations loss was not the product of the fraud, then the jury is directed to find for the defendants. Thus, even if the companies were essentially worthless at the time the stock was sold, subsequent aggravation of the financial plight of the corporations by the plaintiff would preclude recovery for loss sustained at the time of the sale. While it may have been proper to tell the jury that the plaintiff was not entitled to recover for operations losses sustained for reasons other than the alleged fraudulent misrepresentation, it was improper to tell the jury that operations losses not caused by the fraud precluded recovery even if the companies were essentially worthless at the time of sale.

Due to the massive amount of evidence which tended to relate to mismanagement subsequent to the sale of the stock, and which tended to demonstrate that mismanagement of the companies caused certain operations losses, Instruction 12 is not harmless. We turn next to that evidence of subsequent mismanagement.

*Subsequent Mismanagement.*

The defendants, over ITC's strenuous and continued objection, introduced a

---

3. Arkansas uses the "out of pocket" damage standard; that is, the value of what the plaintiff has parted with compared with the actual value of the stock at the time of the sale. McDonough v. Williams, *supra,* 92 S. W. at 786. This damage standard is more ·restrictive than the "loss of bargain" rule which prevails in other jurisdictions, and which allows recovery for the difference between the actual value of the stock at the time of sale, compared with the value of the stock had it been as represented. *See* C. McCormick, McCormick on Damages, *supra,*

§ 121 at 448. Cases applying these two rules are collected in Anno., Damages-Fraudulent Representations, 13 A.L.R.3d 875, § 9 at 942–948 (1967); Anno., Fraud in Sale of Securities-Damages, 108 A.L.R. 1060 (1937); Anno., Fraud in Sale of Securities-Damages, 47 A.L.R. 1142 (1928). Ordinarily, under either rule, "[T]he practice is well settled that the value of what the plaintiff received is to be determined by its value at the time of the sale . . . ." C. McCormick, McCormick on Damages, *supra,* § 122 at 456–457.

great deal of evidence relative to the mismanagement of the companies *after* they had been acquired by ITC. ITC contends that this evidence, in conjunction with Instruction 12, was designed to mislead the jury. Specifically, it said that the evidence was introduced to direct the jury's attention to the cause of "operations" losses. ITC argues that the cause of the operations losses was irrelevant, since under Arkansas law the value of the stock was to be determined as of the time of sale. In response, the defendants contend that the evidence established that the businesses were financially sound at the time of sale.[4]

The evidence to which ITC takes objection and which related to times subsequent to the purchase of the stock may be summarized briefly as follows: disbursement of PL&I loan reserves to AHB; an extremely complicated transaction between the Richmond Life Insurance Company, the Community National Life Insurance Company, John Haldi, Maurice Markham and PL&I (the Haldi deal); PL&I's acquisition of California real estate and the subsequent trade of this property for an interest in Amco Industries of Chicago (Amco deal); PL&I's bankruptcy and the circumstances surrounding the bankruptcy. The net thrust of all this evidence was that ITC, principally through Markham, had grievously mismanaged AHB and PL&I after ITC had acquired the companies.

The primary question to be answered is whether mismanagement of AHB and PL&I in 1967 tends to prove that these companies were valuable in late 1965. There is no contention that ITC was claiming recovery for losses sustained after the sale of stock. Indeed by objection to the defendants' opening argument, by continued objection during trial, by objection to the court's instructions, by proposed instruction, and by closing argument, ITC contended that

"everything that happened after the dates of this sale and after all of the money had been paid . . . is completely irrelevant . . .."

We emphasize that this evidence of subsequent mismanagement was apparently not offered by the defendants to prove the value of the companies at the time of sale. For example, when defense counsel alluded to PL&I's disbursement of loan reserves to AHB, ITC's counsel objected to the absence of

> some showing that these transactions . . . that have followed the sale of these businesses . . . had any effect upon what the net worth of these companies were at the time that the sale was made, that all of these matters are completely irrelevant and immaterial . . . and we understand we have a continuing objection.

Defense counsel replied:

> [A]ll of these matters that transpired after Mr. Markham took over are introduced not only for laches and estoppel but also going to the creditability (sic) of Mr. Markham.

In closing argument, defense counsel further explained why this evidence of subsequent mismanagement was presented:

> I told you that I would prove the Englehart Insurance Agency deal. I told you that I would prove the Hot Springs land deal, the Encore deal, the California land deal, the Haldi fiasco. We did so.
>
> Maurice Markham is guilty of criminal fraud on the depositors and shareholders of Peoples Loan and Investment Company. . . .
>
> [This] is important for two reasons. One, to show you what kind of man Maurice Markham is. . . . It is important for a second reason, and the second reason is that Maurice Markham acted for [ITC] on every

---

4. The defendants also indicate that evidence of subsequent events was relevant for other purposes; for example, to impeach certain of ITC's officers. That theory is questionable, but the issue before us is whether the jury was entitled to consider the evidence of subsequent mismanagement for the purpose of determining the value of the stock, especially in light of Instruction 12.

transaction in which the plaintiff, [ITC] relies in this lawsuit.

Even assuming that evidence of subsequent mismanagement may, in some circumstances, be used to prove value at the time of sale, it is undisputed that there must be some reason to link the subsequent mismanagement with the value of the stock at the time of sale. Thus in a case where a purchase of bank stock was attacked by the buyer for fraud, one court has said:

> The trial court should be careful to admit only competent testimony tending to show the value of the assets *at the time of the exchange.*

Rardon v. Davis, 52 S.W.2d 193, 195 (Mo.App.1932) (emphasis in original), cited with approval in 12A W. Fletcher, Fletcher Cyclopedia of Corporations § 5601 at 182, 183 n.4 (Wolf ed. 1972). The party offering evidence of subsequent mismanagement would be required to demonstrate a link between the subsequent mismanagement and value of the stock at the time of sale. As graphically demonstrated by defense counsels' trial statements explaining why this evidence was offered, no such link between subsequent mismanagement and value at the time of sale was established.

No case has been called to our attention which equates subsequent mismanagement with intrinsic worth at the time of the sale. The closest case we have been able to find is Smith v. Reynolds, 94 Vt. 28, 108 A. 697, 703 (1920). In that case the Vermont Supreme Court held that it was error for the trial court to exclude evidence that the corporation had gone into bankruptcy because of the embezzlement of an employee. The evidence was offered by the defendants. The court said:

> As the case was being tried on the question of damages, it was error to exclude this evidence. The plaintiff

had gone into the financial affairs of the company at great length in support of his claim that the stock was worthless when he bought it. *It thus became* material for the defendants to show that the failure of the company was due to mismanagement.

*Id.* (Emphasis supplied.) In *Smith* the *plaintiff* was the first to raise the subsequent financial collapse of the corporation in order to prove the stock was not valuable when purchased. It therefore · became necessary for the defendants to explain the collapse of the corporation.

From the outset, in this case, it was the *defendants* who chose to speak first of the subsequent mismanagement and collapse of the companies.[5] During one of defense counsel's opening statements the issue arose:

> THE COURT: I understand what counsel was going to do was to go into and show that the actions of the Investors, I mean the plaintiff corporation, together with Mr. Markham, *after* they took charge on November 12, resulted in the debacle that they got into.
>
> [Defense Counsel]: That is correct, Your Honor.
>
> THE COURT: You're objecting to that testimony or any part of it?
>
> [Plaintiff's Counsel]: Object to those because we think it's irrelevant, the condition of the company at the time these people exercised their options and executed Option to Purchase, the events leading up to the transaction.
>
> THE COURT: Overruled.
>
> [Plaintiff's Counsel]: As to the worth of the company at that time, Your Honor.
>
> THE COURT: Overrule your objection.

(Emphasis supplied.)

5. During oral argument one of the defendants' counsel was asked whether ITC referred to the bankruptcy of PL&I in its opening statement. Counsel replied that there was such a reference. However, counsel, by letter, has frankly indicated that he was mistaken and no such reference was made. Our reading of the transcript of the opening statements, transcribed after oral argument, confirms this fact.

In another opening argument, another defense counsel raised the specter of bankruptcy:

> Now, they put it in bankruptcy because Mr. Markham, we will prove to you, invented a new type of transaction in Arkansas. He invented the loan that has no liability on it.

ITC did call as a witness the Trustee in Bankruptcy. But it appears the reason the Trustee was called as a witness was to demonstrate that, as custodian of the records and files of PL&I, he could not recall seeing an independent audit which was conducted *prior* to the sale of stock and allegedly not disclosed to the plaintiff at the time of sale. ITC also used the Trustee in an attempt to explain that the business deals entered into by Markham, and raised by the defendants in cross-examination of Markham, were profitable to ITC and did not result in operations losses to ITC. It is clear that the Trustee was not called by ITC for the purpose of putting the bankruptcy in issue.[6]

█ In Bain v. Deal, 251 Ark. 905, 475 S.W.2d 708 (1972), the Arkansas Supreme Court considered an action by corporate stock buyers seeking to recover damages against stockbrokers for common law fraud. The buyers had allegedly sold the stock after it had been obtained from the brokers. From this fact it was contended that "the representations of [the brokers] were not the cause of any damages . . . ." *Id.* at 713. After questioning the factual basis for the assertion that the buyer had sold the stock, the Arkansas Supreme Court concluded: "At any rate, the *damage was sustained when she bought the 50 shares of stock*; the loss of the $1,000 came at that time." *Id.* at 713–714.

(Emphasis supplied.) Applying the *Bain* decision here, we believe that value must be determined as of the time of purchase. The defendants' inquiry into subsequent operations losses was irrelevant for the purpose of determining the value of the stock as of the time of sale and, its admission was prejudicial error.

As a consequence, we conclude that ITC is entitled to a new trial. The judgment is hereby reversed, and the case is remanded for new trial in conformity with the views expressed herein.

STEPHENSON, Circuit Judge (concurring and dissenting).

I agree that this cause must be reversed and appellant granted a new trial. Instruction No. 12 was erroneous and under the circumstances aptly described by the majority the error was not harmless.

However, I disagree with that portion of the opinion which appears to hold that "The defendants' inquiry into subsequent operations losses was irrelevant for the purpose of determining the value of the stock as of the time of sale * * *." I agree that absent appropriate instructions, the jury may have been misled as to the relevance of this evidence. Once the plaintiff offered evidence with respect to the financial condition of the company at the time of purchase, it was proper for defendants to offer evidence of subsequent events to the extent that they had bearing on the value of the company as of the time of the purchase. Plaintiff called the Trustee in Bankruptcy which brought to the attention of the jury that the company was in bankruptcy. As a matter of fact, the evidence discloses that the company was in bankruptcy less than three years after its purchase [1] by plaintiff. Under

---

6. The defendants argue that it would be unfair to allow ITC to indirectly inform the jury that PL&I went into bankruptcy by means of calling the Trustee as a witness, unless the defendants could explain the reason for bankruptcy. We do not agree. As we have previously suggested throughout this opinion, ITC was only too willing to have the court tell the jury, and did itself tell the jury, that "everything that happened after the dates of this sale and after all the money had been paid . . . is completely irrelevant."

1. Appellees advise in their brief that the collapse of PL&I and Arkansas Loan & Thrift Company received widespread news coverage in the general area of the trial.

these circumstances it would be unfair to not allow defendants to offer evidence to show that PL&I's failure was due to gross mismanagement by plaintiff's manager, Markham. Defendants were entitled to offer evidence in support of their claim that Markham shortly after the purchase caused the company to suffer huge losses.

This evidence should have been received under proper instruction by the court that it was being received for whatever bearing it might have on the value of the company and its stock at the time of plaintiff's purchase and for no other reason. The jury should have been cautioned that mismanagement by the plaintiff and its officers subsequent to purchase does not relieve defendants of their obligation and liability for misrepresentation as to the value of the company and the stock at the time of the purchase, if such existed. On the other hand, plaintiff was not entitled to recover losses aggravated by its own action subsequent to the date of the purchase.